No. 58,118

KOCH ENGINEERING COMPANY, *Appellant*, v. WAYNE C. FAULCONER and MARGARET A. CULP, *Appellees.*

(716 P.2d 180)

Opinion filed March 28, 1986.

*Jerry G. Elliott*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause; and *Robert L. Howard* and *James M. Armstrong*, of the same firm, and the firm of Bond, Bond & Coash, of El Dorado, were on the briefs for appellant.

*Ervin E. Grant*, of Grant & Hart, P.A., of El Dorado, argued the cause and was on the brief for appellee Wayne C. Faulconer.

*O. J. Connell, Jr.*, of Connell and Connell, of El Dorado, argued the cause and was on the brief for appellee Margaret A. Culp.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by the plaintiff, Koch Engineering Company, from a judgment of the Butler County District Court refusing to set aside as fraudulent certain conveyances of property by defendant Wayne C. Faulconer to his sister, Margaret A. Culp. The issues presented for our review are, first, whether this court should make a de novo review of this case and, second, whether the trial court's decision is supported by substantial, competent evidence in light of the standards applicable in fraud cases.

This action was commenced by Koch on December 18, 1980, to set aside conveyances from Wayne Faulconer to Margaret Culp. Plaintiff contended that the conveyances were fraudulent and were made in violation of K.S.A. 33-102. That statute reads:

"Every gift, grant or conveyance of lands, tenements, hereditaments, rents, goods or chattels, and every bond, judgment or execution, made or obtained with intent to hinder, delay or defraud creditors of their just and lawful debts or damages, or to defraud or to deceive the person or persons who shall purchase such lands, tenements, hereditaments, rents, goods or chattels, shall be deemed utterly void and of no effect."

This action is a sequel to an earlier lawsuit brought by Koch against Faulconer in the district court of Sedgwick County. Our opinion following the appeal in that case may be found in *Koch*

*Engineering Co. v. Faulconer*, 227 Kan. 813, 610 P.2d 1094 (1980). Wayne Faulconer was employed by Koch as an engineer from 1971 until early March 1978. During the latter part of Faulconer's employment with Koch, Koch was the holder of an exclusive licensing agreement from Sulzer Brothers, Ltd., a Swiss corporation, to manufacture and sell a highly technical packing used in rectification towers for the separation of chemicals. As a Koch employee, Faulconer had access to Sulzer technology. Also, while with Koch, he signed a noncompetition agreement. During 1977, Faulconer undertook to utilize Sulzer technology and to establish his own business in direct competition with Koch. He ordered stainless steel wire cloth, using specifications virtually identical to those used by Koch. He placed an order for the manufacture of a crimping machine, using drawings substantially identical to the ones used by Koch. In early 1978, while he was still employed by Koch, Faulconer made proposals to Koch customers offering to sell packing that would possess the technical properties of Koch packing at a price substantially less than Koch's price. In one proposal he used an original Koch drawing which he had taken from Koch, obliterating the Koch title block and the confidentiality notation. This activity resulted in the termination of his employment by Koch and the filing of the first action against him by Koch on March 30, 1978.

Koch's lawsuit was based upon Faulconer's misuse of trade secrets and his misappropriation of protectable exclusive licensing agreements. Koch sought and obtained a temporary restraining order. After a lengthy trial, final judgment was entered on February 8, 1979. This included a permanent injunction enjoining Faulconer from manufacturing, offering for sale, selling or delivering the products, and ordering him to deliver certain parts of the crimping machine to Koch. Faulconer appealed. Meanwhile, he continued his business activity and failed to deliver the parts. Successive motions for citation in contempt were filed by Koch and successfully presented. On November 16, 1979, the trial court held Faulconer in contempt, expanded the injunction, and again ordered Faulconer to deliver certain essential parts of his crimping machine to Koch. The trial court withheld the entry of judgment and the imposition of sanctions for contempt pending the outcome of the appeal. Faulconer appealed from that

order, and the appeals were consolidated here. Later, on December 14, 1979, the trial court entered judgment against Faulconer for some $16,000. While the appeal was pending, some $32,000 was paid into the district court of Sedgwick County by Faulconer's customers on court order, and those sums were paid over to Koch pursuant to court order. It would appear that if the trial court were affirmed on appeal, a substantial additional money judgment against Faulconer, arising out of his contemptuous conduct, was likely.

We have greatly condensed the facts giving rise to the Sedgwick County proceedings. These are set forth in greater detail in our original opinion. See 227 Kan. at 813-25. We deem it important here, however, to note that the original action by Koch against Faulconer was based upon breach of a confidential relationship, double dealing and falsity. Deceit and dishonesty were at the very heart of the acts that created the cause of action and the resulting judgment.

On May 19, 1979, Joseph D. Faulconer, father of Wayne Faulconer and Margaret Culp, died a resident of Butler County, leaving a will by which each of his three children, Wayne, Margaret and Charles, received one-third of his estate. Sometime during the probate of the estate, an attorney in El Dorado prepared a demand note from Wayne Faulconer to Margaret Culp for $100,000. At defendant's request, the note was back-dated to May 29, 1979. Under the terms of the will, Wayne Faulconer received a one-third interest in certain Butler County real estate, 500 shares of stock in A.T. & T. and 1200 shares of Kansas Gas and Electric stock. Upon the closing of Joseph's estate, in May 1980, Wayne immediately sold the stock for something in excess of $47,000 and endorsed the check over to his sister, Margaret. He also conveyed his one-third interest in the real estate, valued at about $50,000, to her. Margaret returned the demand note, marked paid, to Wayne. Margaret endorsed the $47,000 check over to Charles and bought his one-third interest in the realty. Charles conveyed that interest to Margaret.

Our opinion in *Koch Engineering Co. v. Faulconer* was filed on May 10, 1980, and thereafter the Sedgwick District Court held a hearing and entered a final judgment in favor of Koch and against Wayne Faulconer for $107,000, which included the ear-

lier $16,000 judgment. Koch had already received some $32,000, leaving an unsatisfied judgment of $75,000.

The suit now before us was commenced on December 18, 1980. The case was tried and final arguments were made on November 6, 1981, less than one year after the case was commenced. The trial court took the matter under advisement and did not make a decision until March 21, 1985, three years, four months, and fifteen days after trial. This inordinate delay by the trial court forms the basis for the first issue on appeal.

Koch first contends that there should be no presumption of the validity of a trial court's findings of fact when those findings are rendered almost three and one-half years after the trial of the case, and prior to the time that a transcript of the trial proceedings is prepared. Appellant recognizes the familiar rule that where a trial court has made findings of fact and conclusions of law, the scope of appellate review is for this court to determine whether the trial court's findings are supported by substantial, competent evidence and whether the findings are sufficient to support its conclusions of law, which will not be set aside unless clearly erroneous. See *American States Ins. Co. v. Ehrlich*, 237 Kan. 449, 452, 701 P.2d 676 (1985); *Woods v. Midwest Conveyor Co.*, 236 Kan. 734, Syl. ¶ 2, 697 P.2d 52 (1985); and *City of Council Grove v. Ossmann*, 219 Kan. 120, 546 P.2d 1399 (1976). Also, upon appellate review, this court accepts as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the trial court, and this court disregards any conflicting evidence or other inferences which might be drawn therefrom. *American States Ins. Co. v. Ehrlich*, 237 Kan. at 452.

Koch points out that no transcript of the proceedings was prepared and thus none was available to the judge when he made his findings of fact three and one-half years after trial. It also points to the many incomplete and incomprehensible passages in the transcript indicating that the reporter was unable, because of the passage of so much time, to adequately decipher his notes. In support of this contention, appellant relies upon the case of *Smith v. Tri-State Transit Co. of Louisiana*, 175 So. 83 (La. App. 1937), where the judgments were not rendered by the trial court until eleven months after the conclusion of trial, and the testimony was not transcribed prior to the rendition of the judgments. The Louisiana Court of Appeal observed:

"In view of these facts, there was greater possibility of the trial judge falling into error than would be the case had decisions been made immediately after trial, or with the transcribed testimony before him." p. 83.

The Louisiana appellate court then proceeded to review the evidence in the case and to determine the facts for itself. The Louisiana case apparently stands alone: we have found no other cases supporting this rule. The trial court did see and hear the witnesses in the case and may well have had some recollection of their appearance, plus his own notes and recollection of the testimony. After holding the matter under advisement for a period of over three years, the trial court in effect adopted the proposed findings of the defendants on critical issues of fact, rather than preparing its individual findings. Even so, we decline to adopt the Louisiana rule. We will, however, carefully examine the record under our present rules.

We turn now to the determinative issue on appeal—whether the decision is supported by substantial, competent evidence, and whether the trial court applied the proper burden of proof under the circumstances of this case. Our court recently set out the elements of fraudulent conveyance and enumerated six badges or indicia of fraud in *Credit Union of Amer. v. Myers*, 234 Kan. 773, 778, 676 P.2d 99 (1984):

"In general, the elements which comprise a fraudulent conveyance are first, an intent on the part of the grantor to hinder, delay or defraud his creditors and second, the participation of the grantee in such fraudulent scheme or such knowledge on the latter's part of facts and circumstances as would import knowledge of the fraud to him. This court has recognized six badges or indicia of fraud. The badges or indicia of fraud are: (1) a relationship between the grantor and grantee; (2) the grantee's knowledge of litigation against the grantor; (3) insolvency of the grantor; (4) a belief on the grantee's part that the contract was the grantor's last asset subject to a Kansas execution; (5) inadequacy of consideration; and (6) consummation of the transaction contrary to normal business procedures."

The above list, of course, is not intended to be exclusive. As the Supreme Court of Oklahoma said:

" 'The possible indicia of fraud are so numerous that no court could pretend to anticipate and catalog them.' " *Toone v. Walker*, 115 Okla. 289, 291, 243 Pac. 147 (1926).

Similarly, in 37 Am.Jur.2d, Fraudulent Conveyances § 10, we find:

"The facts which are recognized indicia of fraud are numerous, and no court could pretend to anticipate or catalog them all."

Also, in 37 C.J.S., Fraudulent Conveyances § 79:

"While some courts, without purporting to set forth an exhaustive list, have enumerated many of the more common badges of fraud, the possible indicia of fraud are so numerous that no court could undertake to anticipate and catalog them all; they are as infinite in number and form as are the resources and versatility of human artifice."

The general rule is, of course, that fraud is never presumed and must be established by clear and convincing evidence. The burden of establishing fraud is upon the party asserting it. Direct evidence of fraud is not always available; more frequently fraud must be established by circumstantial evidence.

As we said in Syl. ¶ 2 of *Credit Union of Amer. v. Myers*, 234 Kan. 773:

"Honesty and fair dealings are presumed, and one charging fraud must prove the same. Direct proof of fraud can seldom be obtained. Such evidence is not absolutely essential to establish the dishonest purpose of the parties to a pretended transfer of property. The fraudulent purpose may be shown by the conduct and appearance of the parties, the details of the transactions, and the surrounding circumstances."

The trial court found that Margaret Culp and her husband kept large sums of cash in a locked filing cabinet in their home while living in Panama and later in California; and that Margaret was never aware that Wayne had been sued for money or a judgment rendered until she was served in this action. It found that during the period from 1974 to 1978 Margaret loaned money to Wayne by giving the money to her father to give to Wayne, knowing that her father would protect her on the repayment of the money. It found that in May 1979, Wayne acknowledged to his brother, Charles, that he was indebted to Margaret. Finally, the trial court found that on May 29, 1979, Wayne, at the insistence of Margaret, who wanted the debt evidenced by a writing, went to the office of attorney Bob Green, where a note was prepared, signed by Wayne and delivered to Margaret. The court also found that Green stated that he knew that an indebtedness of Wayne to Margaret existed before Joseph Faulconer's death. After reciting the various principles applicable in fraud cases, the trial court concluded that a badge of fraud is little more than a suspicious circumstance, that the so-called badges of fraud do not exist in this case sufficient to give rise to an inference of fraud, and that petitioner has failed to produce clear, convincing evidence that a

fraud was committed by Wayne Faulconer or that Margaret Culp participated in the fraudulent scheme.

We agree with the trial court that badges of fraud are suspicious circumstances, but more need be said about them. Badges of fraud are circumstances frequently attending conveyances and transfers intending to hinder, delay, or defraud creditors. They are red flags, and when they are unexplained in the evidence, they may warrant an inference of fraud. Some are weak; others are strong. One weak badge of fraud, standing alone, would have little evidentiary value in establishing a fraudulent conveyance. For example, the mere fact that grantor and grantee are related, standing alone, would not support a finding that the conveyance was fraudulent. On the other hand, the concurrence of several badges of fraud are said to make out a strong case. See 37 C.J.S., Fraudulent Conveyances § 79; 37 Am. Jur. 2d, Fraudulent Conveyances § 10; *Brennecke v. Riemann*, 102 S.W. 2d 874, 877 (Mo. 1937); and see *Hildebrand v. Harrison*, 361 P.2d 498, 505 (Okla. 1961), where it was said:

"In Apple v. American Nat. Bank of Ardmore, 104 Okl. 69, 231 P. 79, 82, we said in the second paragraph of the syllabus that 'If a transfer is made by a debtor in anticipation of a suit against him, or after a suit has begun, and while it is pending against him, this is a badge of fraud, and especially if it leaves the debtor without any estate, or greatly reduces his property.' As heretofore pointed out, the Ravenscraft-Hildebrand conveyance was made after the Huston suit had been filed.

"We had this to say in the third and fourth paragraphs of the syllabus to Toone v. Walker et al., 115 Okl. 289, 243 P. 147:

" ' "Badges of fraud" are suspicious circumstances that overhang a transaction, or appear on the face of the papers. The possible indicia of fraud are so numerous that no court could pretend to anticipate and catalog them. A single one may stamp the transaction as fraudulent, and, when several are found in combination, strong and clear evidence on the part of the upholder of the transaction will be required to repel the conclusion of fraud.' "

As we have noted, the party who alleges fraud has the burden of proving it. This does not mean the party must come forward with direct evidence of fraud. When the party produces evidence of several badges of fraud, that evidence, if unrefuted and unexplained, may well be sufficient to fulfill the party's burden of proof. While the burden does not shift, the opposing party then has the opportunity of going forward with the evidence, for, as we said in *Polk v. Polk*, 210 Kan. 107, 499 P.2d 1142 (1972):

"Where the circumstances surrounding the execution of a conveyance are

such that an inference of fraud may be drawn therefrom, such inference is subject to being rebutted." Syl. ¶ 5.

Turning to the evidence to support the trial court's findings of fact, Margaret Culp testified that while her husband was in the service and they were living in Panama, they kept large sums of money, up to $10,000, in cash. They continued to do this after he retired and they moved to California, keeping the cash in a locked file cabinet in their home. She testified that she knew that Wayne had legal problems after he left Koch, but she first knew about the money judgment when she was sued. She testified that she loaned Wayne large sums of money in cash from 1974 through 1978, but gave the money in cash to her father to deliver to Wayne. Wayne Faulconer testified that he received money as a loan from his sister during the period in question, and both testified that the note was prepared and signed on the date it bears. Charles Faulconer testified that on the day following his father's funeral, Wayne had said he was trying to start up his business and Margaret had loaned him some money. Attorney Green testified that he had prepared the note. He discussed it with Wayne: Wayne said he was indebted to his sister and wanted something in writing. Green believed that the note was not prepared on the date stated thereon, but was backdated at Wayne's request. Wayne's father, before his death, made a statement to Green that he was concerned about Wayne's obligations. He did not say to whom the obligations were.

The bulk of the evidence pointing to critical issues in this case came from the defendants, Wayne Faulconer and Margaret Culp. Certain of their testimony was, to say the least, suspect.

First, we look to see if there was evidence of an intent on the part of the grantor, Wayne Faulconer, to hinder, delay, or defraud his creditors. The evidence is undisputed that Koch secured an injunction, from which Faulconer appealed. Thereafter, Faulconer was repeatedly cited for contempt and the Sedgwick District Court found that Faulconer's conduct was not a mere technical violation, but was part of a pattern of conduct aimed at circumventing the court's orders. It was a flagrant and intentional violation, amounting to bad faith conduct. $32,000 was paid into the clerk of the court under the court order; that money was ordered paid over to Koch even though Koch's judgment against Faulconer was then only $16,000. The trial court with-

held the entry of judgment and the imposition of sanctions for contempt until the appeal was decided. This was prior to the conveyances from Wayne to Margaret. Wayne testified that when he executed the note to Margaret in 1979 he did not think there was any suit against him—yet the case had been pending since March 1978. It was pending when he conveyed the real estate and the proceeds of the stock sales to Margaret. For most of the two-year period following his discharge by Koch, Faulconer was unemployed and was engaged in furthering his business in violation of the Sedgwick District Court's orders. His income from that business was effectively dried up when the trial court ordered his customers to make payment into court of amounts owed to him and further required him—under repeated threat of contempt—to deliver to Koch some of the essential parts of his crimping machine necessary in the manufacturing process. There is nothing in the record to suggest that he had substantial income or assets out of which any judgment in favor of Koch could be satisfied, except the property conveyed to Margaret. This evidence was sufficient to establish the required intent on the part of Wayne Faulconer.

We next turn to examine evidence of the badges or indicia of fraud to determine whether it was "sufficient to give rise to an inference of fraud." The first badge is that of a relationship between the grantor and the grantee. Wayne and Margaret were brother and sister. That relationship is not contested.

The second badge is the grantee's knowledge of litigation against the grantor. During her testimony, Margaret acknowledged that she knew that Wayne had legal problems after he left Koch. He was her baby brother and she was very close to him. She testified that she first knew about the money judgment when she was sued in this action. The principal money judgment, however, was not entered until after the transfer of property. She may well not have known about the precise details of the lawsuit until she was served with summons herein. That, however, is not required; all that is required is that the grantee have knowledge of litigation against the grantor. Margaret admits that she had that knowledge. The lawsuit by Koch had substantial impact upon Wayne Faulconer, with whom she was "very close." The evidence clearly establishes that Margaret knew about the litigation. This badge was established.

The next badge of fraud is that of the insolvency of the grantor. Since the entry of the judgment, Koch has been unsuccessful in enforcing it. Koch found no property to apply on its judgment other than relatively modest amounts secured by garnishment from Wayne's present employer. Wayne testified that his present property interests consist of exempt property—his home and his car and the things therein. While there is testimony that he at one time owned some stock futures, there is nothing in the evidence to indicate that he had substantial market investments or other property at the time of the transfer.

Finally, we examine the evidence as to whether consumation of the transaction was contrary to normal business procedures. The evidence before the trial court of the monetary transactions between Margaret Culp and Wayne Faulconer are outside the normal, customary and usual methods of doing business between a resident of California and a resident of Kansas, even between brother and sister. Margaret Culp testified in substance that during the period from 1974 to 1978, at Wayne's request, she loaned substantial sums of money to him. Every penny of this was delivered in cash, not directly to Wayne but through their father, Joseph, who would make trips to California and carry the cash back to Wayne, who lived in Wichita. Margaret testified that she customarily kept large sums of cash, as much as $10,000, in a locked file cabinet at home. There was no explanation, however, of where this $10,000 came from, let alone where the the other $90,000 in cash came from. Margaret Culp, a college graduate, has worked most of her adult life as an accountant for various firms of certified public accountants and others. She is still doing some accounting work, part-time. Yet she had no record of the dates or amounts of any of her loans to Wayne, and no memory of any dates or any amounts. She thought she might have loaned him as much as $15,000 at one time, but she had no specific recollection, did not remember when, and had no record to support her testimony. She had no cancelled checks, no cash withdrawal slips, no documentation of any kind.

Wayne Faulconer likewise had no documentation to support the loans. He had no record of receiving any money at any time from his sister, Margaret. Though he testified that some of the money went into the bank, he had no deposit slips or other records indicating the deposit of large sums of cash. He could not

identify any deposit in his account as having come from Margaret. He testified that the loans came on various dates in varying amounts, some even and some odd, adding up to $100,000. While both Wayne and Margaret testified that they had kept notations of some sort, neither had retained their records. Margaret testified that she made the loans through her father because she knew he would keep a record of them and protect her, yet no record of the loans was found among the father's personal effects after his death. He made no change in his will to protect Margaret. The loans extended over a period of at least three years prior to the time Wayne commenced his own business, and there was no explanation as to why Wayne needed to borrow substantial sums during that period of time.

In short, there was a wealth of substantial evidence establishing badge after badge of fraudulent conduct. The evidence supporting the trial court's findings which we have outlined above was minimal and for the most part highly suspicious and questionable. Examples: a serviceman keeping large amounts of cash—up to $10,000, in his living quarters; ordinary, college-educated civilians keeping $10,000 to $100,000 at home, uninvested and in cash, in a file cabinet; large loans made in cash, by courier, from a sister in California to a brother in Kansas; no living witnesses, except the principals, to the transactions; an accountant who keeps no records and has no memory of dates or amounts of her substantial investments; the transfer of large sums over a period of years without a single trace or record; nothing disclosed about the transactions by Wayne or Margaret to any living witness until after Wayne, the target of substantial litigation, inherits substantial property; backdating the note, the only writing offered to support the obligation; the coincidence that the transfers, ten or fifteen of them, in varying and odd amounts, equaled an even $100,000—which just happens to be the approximate value of the inheritance.

Under the circumstances, we do not find substantial support in the record for the trial court's findings and conclusions.

The judgment is reversed and the matter is remanded for a new trial before an assigned judge.