**Jerry W. GADDIS, Defendant–Appellant,**

v.

**Lynn D. ALLISON, Trustee of the Bankruptcy Estate of dot Drug Stores, Inc., Plaintiff–Appellee.**

**No. 98–1418–JTM.**

United States District Court, D. Kansas.

May 26, 1999.

---

**7.** Section 547(c) already contains a number of defenses or ʿexceptions to a trustee's avoid-

ance action.

---

*MEMORANDUM AND ORDER*

MARTEN, Judge.

This is an appeal from a judgment in an adversary proceeding in the United States Bankruptcy Court for the State of Kansas. Three issues are before this court: (1) whether the bankruptcy court erred in

concluding certain transfers totaling $655,-000.00 from dot Drug Stores, Inc. ("dot") to Gaddis were fraudulent; (2) whether the bankruptcy court erred in holding that Gaddis's counterclaim to recover funds reclaimed by the bankruptcy estate was barred under the doctrine of res judicata; and (3) whether the bankruptcy court erred in approving the applications for compensation as special counsel to the Trustee. For the reasons set forth below, this court affirms the bankruptcy court's rulings with respect to the $655,000.00 in fraudulent transfers and special counsel fees, but reverses the bankruptcy court's determination regarding the Trustee's entitlement to summary judgment based on the doctrine of res judicata.

## I. Standard of Review

"The district court sits as an appellate court when an appeal is taken from the bankruptcy court." *United States v. Domme (In re Domme),* 163 B.R. 363, 365 (D.Kan.1994) (citing 28 U.S.C. § 1334(a)). The Tenth Circuit has made the following remarks with respect to the district court's role as an appellate court:

> Just as the court of appeals may not conduct an evidentiary hearing for a bankruptcy appeal, so too a district court may not conduct such hearing when it is acting in its capacity as an appellate court. In a bankruptcy appeal, a district court may alter or amend its judgment pursuant to Fed.R.Civ.P. 59(e), but may not conduct a hearing to take additional testimony or other evidence.

*Branding Iron Motel, Inc. v. Sandlian Equity, Inc. (In re Branding Iron Motel, Inc.),* 798 F.2d 396, 399 (10th Cir.1986). The district court may affirm, reverse or modify the bankruptcy court's rulings or remand the case with instructions for further proceedings. Fed.R.Bankr.P. 8013. Conclusions of law are reviewed de novo. *United States v. Richman (In re Talbot),* 124 F.3d 1201, 1206 (10th Cir.1997). However, this court is bound by the factual findings of the bankruptcy court unless such findings are clearly erroneous. *Securities Investor Protection Corp. v. Stellatos (In re Blinder, Robinson & Co.),* 124 F.3d 1238, 1241 (10th Cir.1997); *Richman,* 124 F.3d at 1206. "A finding is clearly erroneous if it is unsupported by any facts of record or if the appellate court after reviewing all the evidence is left with the definite and firm belief that a mistake was made." *In re Smith,* 195 B.R. 468, 470 n. 1 (D.Kan.1996). Thus, if there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *In re Stanton,* 136 B.R. 562, 563 (D.Kan.1992). In addition, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Wittman v. Toll (In re Cordry),* 149 B.R. 970, 974 (D.Kan. 1993).

## II. Factual Background

The debtor, dot, previously operated a chain of retail drugstores throughout the United States. Jerry Gaddis was a shareholder and officer of dot. On December 6, 1991, he acquired all of dot's outstanding common stock from the other existing shareholders and became the company's sole shareholder, officer and director. As an employee and officer of dot, Gaddis was paid $75,000.00 per year, plus a $25,000.00 bonus.

At the time Gaddis acquired dot's outstanding stock, dot was suffering from extreme financial difficulty. As of November 30, 1991, and at all times thereafter, dot was insolvent. In December 1991, Gaddis determined dot would have to discontinue operations and conduct a liquidation of its assets. Bergen Brunswig Drug Company ("Bergen") was the major supplier of retail products sold by dot, as well as dot's largest secured creditor. As of December 27, 1991, dot owed Bergen $11,212,077.46. Bergen had a perfected security interest in substantially all of dot's assets, evidenced by two promissory notes dated January 31, 1990, executed by dot in favor of Bergen in

the amount of $10 million and $3 million respectively, and a financing agreement, executed by dot in favor of Bergen on January 31, 1990.

In January 1992, dot, acting through Gaddis, entered into a series of agreements with Bergen and Zahn Associates, Inc. ("Zahn"), a liquidation specialist, providing for the sale of dot's inventory and assets. Dot and Bergen entered into the first agreement ("Original Agreement") on January 5, 1992. On January 17, 1992, dot and Zahn became parties to an Extension Agreement. On that same day, dot and Bergen amended their Original Agreement ("First Amendment"). Pursuant to the First Amendment, dot was to pay Bergen 100% of the proceeds from the liquidation of dot's assets until such time as dot's debt to Bergen was reduced to a principal balance of $2.4 million, after which the next $1.1 million realized from the liquidation was to be paid equally to Zahn (acting on behalf of dot's unsecured creditors) and Gaddis, and an additional $400,000.00 was to be paid to Gaddis. The Original Agreement provided that all proceeds from the liquidation of dot's assets were to be placed in dot's accounts and then transferred from dot to Bergen on a regular basis. Zahn's role in the liquidation endeavor was to obtain the unsecured creditors' cooperation with the liquidation and to keep them from forcing dot into involuntary bankruptcy.

Pursuant to the Extension Agreement dated January 17, 1992, Zahn agreed to attempt to obtain consent to an orderly liquidation from 85% of dot's unsecured creditors. As of December 6, 1991, dot owed its unsecured creditors in excess of $1 million dollars.

Between December 6, 1991 and May 15, 1992, Gaddis continued to receive ordinary payroll payments, accrued vacation pay, and expense reimbursements from dot. In addition to his normal compensation, Gaddis made the following money transfers to himself from the liquidation of dot's assets:

| Date | Amount |
| --- | --- |
| 2/26/92 | $250,000.00 |
| 3/11/92 | $ 40,000.00 |
| 3/11/92 | $ 50,000.00 |
| 4/22/92 | $150,000.00 |

In February 1992, Gaddis also transferred from dot to himself a 1992 BMW 735–IL worth $45,000.00 at the time. Between June 1992 and March 1993, Gaddis transferred an additional $120,000.00 to himself from the liquidation of dot's assets. All of the funds and property transferred to Gaddis between February 1992 and March 1993 were transferred directly from dot bank accounts to Gaddis. No board of directors' minutes or written agreements between dot and Gaddis exist authorizing Gaddis to transfer funds from the liquidation of dot assets to himself. Gaddis did not use any of the funds or property he received from dot's liquidation to pay any of dot's obligations to its unsecured creditors. Further, Gaddis provided no consideration for the transfers of dot's assets he received in excess of his normal salary and benefits.

On or before March 9, 1992, dot reduced its debt to Bergen to $2.4 million. After Bergen's debt was reduced to $2.4 million, approximately $985,000.00 from the liquidation of dot's assets was placed in dot's depository account. That amount represents the total funds transferred to Zahn and Gaddis directly by dot. Pursuant to the Extension Agreement, $330,000.00 was transferred from dot's account to Zahn for placement in an escrow account. In March 1992, dot discontinued transferring funds to Zahn for placement in the escrow account. Dot's assets were completely liquidated by May 15, 1992.

A dispute arose over whether Zahn obtained the requisite 85% of unsecured

creditors' acceptances it had promised in the Extension Agreement. Zahn filed suit against dot and Gaddis in the United States District Court for the District of Kansas seeking a determination that it had obtained the required 85%. On July 19, 1993, Judge Kelly held that under the terms of the agreement, Zahn had not obtained the necessary consent from unsecured creditors and found that the agreement between dot and Zahn was void. Judge Kelly did not determine whether the money belonged to dot or Gaddis.

On August 20, 1993, three of dot's unsecured creditors filed an involuntary Chapter 7 bankruptcy petition against dot. Gaddis requested that the district court in the Zahn litigation order Zahn to turn over to Gaddis the $330,000.00 Zahn had placed in escrow for payment to the unsecured creditors pursuant to the Extension Agreement. Judge Kelly denied that request on September 3, 1993.

On October 1, 1993, the bankruptcy court entered an order for relief against dot, and appointed an interim trustee. On November 4, 1994, Judge Kelly signed an order directing the funds held by the district court to be paid to the Trustee. On April 2, 1996, upon a motion by Gaddis, this court set aside Judge Kelly's November 4, 1994 order and directed the bankruptcy court to proceed to independently review the ownership of the funds at issue.

On August 25, 1995, the Trustee filed an adversary proceeding in the bankruptcy court, seeking among other things a determination that the $655,000.00 Gaddis had transferred to himself from dot constituted fraudulent conveyances which could be avoided by the Trustee. Gaddis filed a counterclaim for the $330,000.00 from the Zahn litigation that had been turned over

to the bankruptcy estate pursuant to Judge Kelly's order of November 4, 1994. On May 15, 1996, the bankruptcy court granted partial summary judgment to the Trustee with respect to Gaddis's counterclaim to recover the $330,000.00 from the Zahn litigation. The bankruptcy court found that the funds were an asset of the estate based on Judge Kelly's ruling on July 19, 1993, which granted dot's motion for summary judgment.[1]

On April 10, 1997, the bankruptcy court denied the Trustee's motion for summary judgment on her claim to the $655,000.00 and denied the motion for imposition of a constructive trust, holding that while the Trustee had established uncontested facts to support most of the elements of a state law fraudulent transfer action, the matter should proceed to trial. The bankruptcy court conducted the trial on July 15, 1998. At trial, the court granted without prejudice the Trustee's motion to withdraw her request for imposition of a constructive trust. On October 29, 1998, the bankruptcy court determined that the $655,000.00 in funds transferred from dot to Gaddis constituted fraudulent transfers under Kansas law and thus could be avoided by the Trustee.

Gaddis filed this appeal, claiming the bankruptcy court erred in concluding that the transfers from dot to Gaddis were fraudulent, that the bankruptcy court erred in holding that Gaddis's counterclaim to retrieve the $330,000.00 recovered by the bankruptcy estate was barred under the doctrine of res judicata, and that the bankruptcy court erred in approving the applications for compensation as special counsel to the Trustee by Husch & Eppenberger.

1. Gaddis sought district court review of the order granting summary judgment. Judge Brown found that the judgment from which Gaddis sought to appeal could not be considered "final," and therefore the district court was without jurisdiction to decide Gaddis's appeal. *Allison v. Gaddis (In re dot Drug Stores, Inc.)*, No. 96–1305–WEB, 1996 WL 633618, at *1 (D.Kan. Sept. 20, 1996) ("The bankruptcy court's order disposed of defendant's counterclaim, but did not address the Trustee's claim against defendant in the same adversary proceeding. Both of these claims must be ruled on before the judgment of the bankruptcy court can be considered final within the meaning of 28 U.S.C. § 158(a).").

## III. Analysis

### A. The $655,000.00 Transfers from dot to Gaddis

The bankruptcy court found that the $655,000.00 in transfers from dot to Gaddis occurring between February 1992 and March 1993 were fraudulent and thus voidable by the Trustee. Gaddis claims the transfers constituted salary from Bergen under the liquidation agreement between Bergen, dot and Gaddis.

 Federal law provides the Trustee with the rights of an actual unsecured creditor; however, the extent of those rights is determined entirely by the applicable state or local law. 5 *Collier on Bankruptcy* ¶ 544.09[2] (15th ed. rev.1997). If the court determines that a fraudulent conveyance is voidable under state law, the Trustee may avoid the transfer pursuant to 11 U.S.C. § 544(b), which states:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

The Kansas Uniform Fraudulent Conveyances Act, K.S.A. § 33–102, provides:

> Every gift, grant or conveyance of lands, tenements, hereditaments, rents, goods or chattels, and every bond judgment or execution, made or obtained with intent to hinder, delay, or defraud creditors of their just and lawful debts or damages, or to defraud or to deceive the person or persons who shall purchase such lands, tenements, hereditaments, rents, goods or chattels, shall be deemed utterly void and of no effect.

 In Kansas, a fraudulent conveyance consists of two elements: "first, an intent on the part of the grantor to hinder, delay or defraud his creditors and second, the participation of the grantee in such fraudulent scheme or such knowledge on the latter's part of facts and circumstances as would import knowledge of the fraud to him." *City of Arkansas City v. Anderson,* 243 Kan. 627, 632, 762 P.2d 183 (1988) (quoting *Koch Engineering Co. v. Faulconer,* 239 Kan. 101, 105, 716 P.2d 180 (1986)). Fraud is never presumed; it must be established by clear and convincing evidence by the party asserting it. *Faulconer,* 239 Kan. at 106, 716 P.2d 180. "Direct evidence of fraud is not always available; more frequently fraud must be established by circumstantial evidence." *Id.* A fraudulent purpose may be shown "by the conduct and appearance of the parties, the details of the transactions, and the surrounding circumstances." *Credit Union of Amer. v. Myers,* 234 Kan. 773, 778, 676 P.2d 99 (1984).

 The Kansas Supreme Court has recognized six "badges" of fraud:

> (1) a relationship between the grantor and grantee; (2) the grantee's knowledge of litigation against the grantor; (3) insolvency of the grantor; (4) a belief on the grantee's part that the contract was the grantor's last asset subject to a Kansas execution; (5) inadequacy of consideration; and (6) consummation of the transaction contrary to normal business procedures.

*Id.* The list of factors cited above is not intended to be exclusive. *Faulconer,* 239 Kan. at 105, 716 P.2d 180. " 'The possible indicia of fraud are so numerous that no court could pretend to anticipate and catalog them.' " *Id.* (quoting *Toone v. Walker,* 115 Okla. 289, 291, 243 P. 147 (1926)).

> [B]adges of fraud are suspicious circumstances, but more need be said about them. Badges of fraud are circumstances frequently attending conveyances and transfers intending to hinder, delay, or defraud creditors. They are red flags, and when they are unexplained in the evidence, they may warrant an inference of fraud. Some are weak; others are strong. One weak badge of fraud, standing alone, would have little evidentiary value in establish-

ing a fraudulent conveyance. For example, the mere fact that grantor and grantee are related, standing alone, would not support a finding that the conveyance was fraudulent. On the other hand, the concurrence of several badges of fraud are said to make out a strong case.

*Faulconer*, 239 Kan. at 107, 716 P.2d 180.

Several of the six badges of fraud are present in this case. First, a close relationship existed between the transferor, dot, and the transferee, Gaddis. Gaddis was dot's sole shareholder, officer and director. As for business relationships, the court can imagine no closer relationship than the one that existed between dot and Gaddis.

Second, dot was insolvent at the time Gaddis made the transfers to himself. The parties stipulated to this point in their final pretrial order. Furthermore, Gaddis knew of dot's insolvency when he became the sole shareholder, officer and director.

Third, Gaddis provided no consideration for the transfers he received. During the time period in which he received the transfers, he continued to receive his full salary and benefits from dot. Gaddis claims the $655,000.00 in transfers constituted salary from Bergen pursuant to their agreement, but the money passed through dot's account before Gaddis transferred it to himself; it did not go directly to him. Therefore, the money belonged to dot and should have been used to pay its creditors.

■ Finally, consummation of the transactions was contrary to normal business procedures.[2] As the bankruptcy court noted, no board of director's minutes authorized Gaddis to transfer dot's liquidation funds to himself. "Secret, hurried or transactions not in the usual course of business are examples of possible fraudu-

lent intention." *Credit Union of Amer.*, 234 Kan. at 780, 676 P.2d 99.

The bankruptcy court further noted that the parties introduced no evidence regarding the second and fourth badges of fraud—the transferee's knowledge of pending litigation and the transferee's belief that the assets were the last assets subject to a Kansas execution. However, as dot's sole shareholder, officer and director, as well as the one performing the liquidation, Gaddis knew at the time he was making transfers to himself that dot's assets were rapidly diminishing, leaving no funds to pay the creditors.

The circumstances surrounding the transfers from dot to Gaddis are similar to those in *Dwyer v. Jones (In re Tri–State Paving, Inc.)*, 32 B.R. 2 (Bankr.W.D.Pa. 1982). In *Dwyer*, the trustee sought to recover funds the defendants had transferred to themselves prior to the corporation's bankruptcy. *Id.* at 3. The defendants were the sole officers, stockholders and directors of the corporate debtor. *Id.* They withdrew all of the funds in the corporation's bank account to finance a trip to Las Vegas, hoping to win enough money to pay the corporation's creditors. *Id.* The trustee claimed the transfers to the defendants constituted fraudulent transfers. *Id.* Like Gaddis, the defendants claimed they were entitled to the money as payment for their salaries. *Id.* Apparently, they had not drawn salaries for an extended period of time, and they claimed they were justified in making the withdrawals. *Id.*

The court found that transactions between a debtor-corporation and its controlling officers must be scrutinized. *Id.* at 4. It held that "[c]orporate directors enjoy privileged access to the company's financial accounts and inside information, a situation ripe for abuse. Corporation-director

---

2. The bankruptcy court noted that even if Gaddis would have followed normal business procedures in transferring the funds to himself, his actions would have constituted a breach of his fiduciary duty with regard to

corporate funds. *See* Memo. of Dec. p. 14. ("[O]nce a corporation becomes insolvent, an officer's fiduciary duty extends not only to the corporation, but also to creditors of the corporation.")

transfers are analogous to intrafamilial transfers: the relationship of the parties encourages collusion and concealment." *Id.* The court ultimately rejected the defendants' contention that they were entitled to the transfers as salary payments. *Id.* "Paying themselves in full by taking unfair advantage of their special positions and knowledge to save themselves from being prejudiced and simultaneously leaving their other creditors with nothing constituted an actual intent to defraud." *Id.; see also Carson v. Davidson,* 248 Kan. 543, 548, 808 P.2d 1377 (1991) ("Under the trust fund doctrine the assets of a dissolved corporation are a trust fund against which the corporate creditors have a claim superior to that of the stockholders, and creditors have the right to follow such assets into the hands of stockholders who hold assets as though the stockholders were trustees.")

The transfers at issue before this court present an even stronger case than *Dwyer* for finding fraudulent transfers. Here, Gaddis continued to receive his normal salary and benefits from dot, unlike the defendants in *Dwyer* who had not received their salaries for a long time. Furthermore, the defendants' intent in *Dwyer* was to turn the money they transferred to themselves into enough money to pay off the corporation's creditors. There is no evidence before this court to suggest Gaddis had any intent to use the money he transferred to himself to pay off dot's creditors.

This court finds that the $655,-000.00 in transfers Gaddis made to himself were clearly fraudulent conveyances under Kansas law. During dot's liquidation, Gaddis continued to receive his salary and benefits. Gaddis does not argue that the transfers were intended to be salary from dot for the work he was doing on the liquidation. Rather, he claims it was salary from Bergen. However, if Bergen intended to pay Gaddis for his liquidation efforts, it would have directly paid the money to Gaddis rather than having the money deposited in dot's account. Once that money was deposited into dot's bank account, Bergen had no authority over the funds. Additionally, dot owed its unsecured creditors in excess of $1 million at the time Gaddis made the transfers. If Gaddis had not transferred the $655,000.00 to himself, the debt to the various creditors could have been reduced significantly. By structuring the transfers to appear as though they were salary from Bergen, Gaddis clearly attempted to deprive dot's creditors of money to which they were entitled.

## B. Gaddis's Counterclaim for $330,-000.00 Held by the Bankruptcy Estate

As previously noted, when dot stopped paying funds into Zahn's escrow account, Zahn filed a lawsuit against dot and Gaddis in the United States District Court for the District of Kansas. Dot and Gaddis both filed answers to Zahn's complaint. Zahn and dot each filed motions for summary judgment. In its motion, dot asked the court to terminate Zahn's security interest in its assets and to order the return of the $330,000.00 in the escrow account. Judge Kelly granted dot's motion, finding that Zahn had breached its agreement when it failed to follow the guidelines for claim dispute resolution and to timely obtain the necessary acceptances from dot's creditors. Gaddis did not file a cross-claim against dot seeking the $330,000.00 at anytime during that lawsuit.

The Trustee in the bankruptcy action filed a motion for summary judgment in the adversary proceeding with regard to Gaddis's counterclaim for the $330,000.00. The bankruptcy court granted the Trustee's motion, finding that Gaddis's claim was barred by the doctrine of res judicata based on Judge Kelly's decision in the Zahn litigation. Gaddis appealed this decision, but as noted previously, Judge Brown refused to decide the issue because the bankruptcy court's order had disposed of Gaddis's counterclaim but it had not ad-

dressed the Trustee's claim against Gaddis. Thus, the bankruptcy court's judgment was not "final" within the meaning of 28 U.S.C. § 158(a).

Because the bankruptcy court has decided all of the issues before it, this court is in a position to determine whether Gaddis's counterclaim is barred by the doctrine of res judicata. For the reasons set forth below, the court finds the doctrine of res judicata does not apply under the circumstances of this case.

 Gaddis was a co-defendant with dot in the Zahn litigation. Therefore, any claim he had against dot with regard to the $330,000.00 would have been brought as a crossclaim under Fed. R.Civ.P. 13(g). Unlike counterclaims, which are compulsory or permissive, crossclaims are always permissive. 6 Charles Alan Wright et al., *Federal Practice and Procedure: Civil 2d* § 1431, at 236. Therefore, "[a] party who decides not to bring his claim under Rule 13(g) will not be barred by res judicata, waiver, or estoppel from asserting it in a later action, as he would if the claim were a compulsory counterclaim under Rule 13(a)." *Id.* Because Gaddis's claim against dot would have been a crossclaim as opposed to a compulsory counterclaim, the bankruptcy court's reliance on the doctrine of res judicata to bar Gaddis's counterclaim is clearly misplaced.

 Whether the $330,000.00 belongs to Gaddis or dot is an issue that has not been decided. Although this court ultimately reaches the same conclusion as the bankruptcy court—*i.e.,* that the money belongs to the bankruptcy estate—it does so based on the evidence, not because Gaddis's counterclaim is barred by the doctrine of res judicata. The uncontroverted evidence establishes that the $330,000.00 came from the liquidation of dot's assets. Gaddis claims the money belongs to him as salary from Bergen pursuant to their agreement. However, this was not really a Bergen–Gaddis agreement. Bergen, as a dot creditor, agreed to take less than 100% of its debt from dot. The funds used to pay Bergen were dot funds. They do not become Gaddis's funds because Bergen agreed not to take them. Because they are dot funds, they should have been used to pay dot's unsecured creditors, and Gaddis is not an unsecured dot creditor.

## C. Special Counsel Fees

Gaddis claims the bankruptcy court erred in approving Husch and Eppenberger's compensation applications. Husch and Eppenberger, as special counsel to the Trustee, made four compensation applications to the bankruptcy court. Gaddis appeals the bankruptcy court's decisions with regard to the last three of the four applications.

Husch and Eppenberger's second application for compensation requested fees in the amount of $10,387.26 for the time period of September 1, 1996 through December 31, 1996; its third application sought $19,234.20 for January 1, 1997 through October 31, 1997; and its fourth application was for $17,331.31 for the period of November 1, 1997 through July 31, 1998. With respect to all three applications, Gaddis did not object to the amount of the fees, but rather objected to the payment of the fees, claiming the estate did not have sufficient funds to pay the fees. Gaddis argued the only funds in the estate were the $330,000.00 he claimed were his. On all three occasions, the bankruptcy court found good cause for granting the compensation applications and overruled Gaddis's objection.

 A bankruptcy court has broad discretion in awarding fees and costs. *In re Roberts,* 75 B.R. 402, 412 (D.Utah.1987). The decision to award fees and costs will be reversed on appeal only if there was an abuse of discretion. *In re Cascade Oil Co.,* 126 B.R. 99, 103 (D.Kan.1991). "Discretion is abused when the judge does not apply the proper legal standards, does not follow the proper procedures, or bases an award on findings of fact that are clearly erroneous." *Id.*

In light of the bankruptcy court's broad discretion in determining whether to award special counsel fees, the court finds the bankruptcy court did not abuse that discretion. The bankruptcy court's decision to award special counsel fees is therefore affirmed.

## IV. Conclusion

For the reasons set forth above, the bankruptcy court's finding that Gaddis fraudulently transferred $655,000.00 to himself from dot is affirmed; its finding that Gaddis's counterclaim is barred by the doctrine of res judicata is reversed, and the court finds the money belongs to the bankruptcy estate; and the bankruptcy court's decision to award special counsel fees is affirmed.