# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-1819

_____

In re: James M. Craig,                                      *
                                                            *
                       Debtor,                              *
                                                            *
_____                                         *
                                                            *
                                                            *
Kip M. Kaler, as Bankruptcy          *   Appeal from the United States
Trustee for James M. Craig,          *   Bankruptcy Court for the
                                     *   District of North Dakota.
            Plaintiff-Appellant.     *
   v.                                 *
                                      *
Anne L. Craig; James M. Craig,        *
                                      *
         Defendants - Appellees  ,    *
                                      *

_____

Submitted: November 18, 1997
Filed: June 11, 1998

_____

Before BEAM, HEANEY, and JOHN R. GIBSON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Kip M. Kaler, Trustee in bankruptcy for James M. Craig, appeals the district court's order dismissing his action to recover fraudulently conveyed property. The Trustee makes an assortment of arguments that there were fraudulent transfers of the Craig family's residence and a savings account from James to his wife Anne, and that

the assets should be placed in James's bankruptcy estate. We affirm the district court's decision on the claim of a fraudulent transfer relating to the savings account. We reverse the district court's decision on the claim of a fraudulent transfer relating to the Craigs' residence and remand to the bankruptcy court.

James Craig is a physician who moved to North Dakota in 1991, bringing with him considerable baggage in the form of a debt to the IRS of over one-half million dollars and financial obligations resulting from a divorce. In 1992, he and Anne married. In July 1993, James contracted to perform physician services for the Carrington Health Center, earning in excess of $200,000 per year. Anne was also employed full-time by the health center, earning approximately $33,000 per year. Anne assumed most of the family's household duties including all cleaning, laundry, and yard work.

In November 1993, Anne signed an agreement to purchase a 17-acre rural homestead north of Carrington for $67,000, contingent upon financing. James sought financing from Security State Bank, which agreed to loan James $82,000 on the condition that Carrington Health guarantee repayment of the loan. Carrington Health agreed to do so and pledged a Certificate of Deposit as security. In return, James delivered to Carrington Health the original of an $82,053 promissory note which the health center had given him for the purchase of his medical practice. James also granted Carrington Health the right to offset its obligations to Security State Bank against the amount owed on the promissory note. On December 10, 1993, James gave the bank a note for $82,000, and the bank loaned James that amount.

Instead of disbursing any cash payment to James, the bank paid $67,377 directly to the sellers of the homestead and deposited the remainder in a Super NOW account under Anne's name. The sellers deeded the homestead to Anne on December 10, 1993, and the warranty deed was recorded on December 14, 1993. The family assumed occupancy on April 4, 1994. James and Anne admit that they titled the property in

Anne's name in an effort to shield it from James's creditors. While the Craigs had the assistance of counsel in these transactions and were advised that the real estate would be James's homestead, no homestead claim of exemption was made in these proceedings.

James made payments on the bank loan until March 1996, when a balloon payment came due. James defaulted, and Security State Bank elected to offset Carrington Health's certificate of deposit against James's indebtedness of $72,791. In turn, Carrington Health offset this amount against the amount it owed to James on the promissory note.

During the time period at issue, the Craigs maintained two checking accounts and three savings accounts, all in Anne's name. Concerned about his IRS debt, James sought the advice of an attorney who, among other things, advised James not to commingle his assets with Anne's. Accordingly, beginning in August 1994, James deposited his income into a Super NOW account in Anne's name, and Anne deposited her earnings into her savings account no. 2559. All household and other living expenses were paid from the Super NOW account, leaving Anne's income and interest untouched. James filed a Chapter 7 bankruptcy on May 1, 1995.

On June 9, 1996, the Trustee commenced an adversary proceeding challenging several transactions between James and Anne, including those relating to the residence and savings account no. 2559, as fraudulent. The Trustee succeeded in obtaining an order for the turnover of either a 1979 Porsche and a 1985 Suburban truck or their value. The bankruptcy court denied the Trustee's claims with respect to the real estate, Anne's savings account, and various vehicles. The district court affirmed the orders of the bankruptcy court.

The trustee concedes that there is no challenge to the findings of fact but only to the conclusions of law. We review the district court's and the bankruptcy court's

conclusions of law de novo.  See C.T. Development Corp. v. D. Barnes (In re Oxford Development), 67 F.3d 683, 685 (8th Cir. 1995).

## I.

The Trustee contends that the value of Anne's savings account no. 2559 is the result of fraudulent transfers from James to Anne and that the account should have therefore been included in the bankruptcy estate.  The trustee argues that even though Anne's earnings were the primary source of the account's funds, those earnings were only available because James used his income to pay the bulk of the family's expenses.  In the alternative, the Trustee contends that the savings account is a joint asset of the Craigs, and that the estate is therefore entitled to some portion of it.

The Bankruptcy Code provides:

> (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily--  . . .
> (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and . . .
> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred . . . .

11 U.S.C. § 548 (1994).  A transfer is defined under the Bankruptcy Code as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property . . . ."  11 U.S.C. § 101 (54) (1994).

The Trustee concedes that the remaining funds in account no. 2559 are attributable to Anne's earnings from her employment with Carrington Health  and from the sale of her Lumina automobile and her real property in South Dakota.  Therefore,

-4-

the Trustee does not contend that James fraudulently transferred his assets directly into Anne's savings account, but rather maintains that James indirectly transferred his assets to Anne by using his income to pay more than his fair share of the family's expenses, thereby allowing Anne to accumulate wealth in account no. 2559.

The burden of proof is on the Trustee to establish each element of a fraudulent transfer under section 548. See Jenkins v. Chase Home Mortgage Corp. (Matter of Maple Mortg., Inc.), 81 F.3d 592, 596 (5th Cir. 1996). The bankruptcy court held that the trustee did not meet this burden, and the district court affirmed. The Trustee's theory is premised on James's payment of the family's expenses. However, under North Dakota law, a husband and wife share a duty to support one another through both their individual property and labor. N.D. Cent. Code § 14-07-03 (1997). Here, James contributed the bulk of the financial support for the family, while Anne contributed the bulk of the domestic labor. In such a case, this court is not in a position to conclude that one spouse's contribution so overwhelmed the other's as to constitute a transfer of assets between marital partners.

James did use his income to pay installments on several vehicles titled to Anne. Normally, these payments would be considered a transfer of assets. The bankruptcy court, however, excluded these vehicles from the bankruptcy estate, concluding that they were not "assets" because Anne had no equity in them, as the value of the vehicles did not exceed the remaining indebtedness on them. The Trustee does not appeal the exclusion of the vehicles from the estate, but instead includes James's payments on the vehicles as part of his argument concerning account no. 2559.

Regardless of whether the payments on the vehicles amounted to a fraudulent transfer of assets, they do not give the estate any rights in Anne's savings account. Under section 548, the Trustee can avoid fraudulent transfers of property out of the debtor's estate and return the transferred property to the estate. To the extent that Anne gained anything from James's payments on the vehicles, it was that they helped to

increase her ownership interests in the various vehicles. Thus, these ownership interests were the assets, if any, that James transferred to Anne. The Trustee has abandoned his attempts to reach the ownership interests themselves because they are of little value given the large amounts Anne still owes on the vehicles. The trustee cannot choose instead to reach assets independent from and more valuable than those allegedly transferred to Anne from James.

The Trustee also argues that account no. 2559 is a joint asset of James and Anne. The savings account is in Anne's name and is comprised solely of Anne's wages and proceeds from sales of her own property. Under North Dakota law, a spouse's earnings are treated as the individual property of that spouse. See N.D. Cent. Code § 14-07-08(2) (1997) ("The earnings of one spouse are not liable for the debts of the other spouse. . . .") Aside from the duty of mutual support, neither spouse has any interest in the property of the other. See N.D. Cent. Code § 14-07-04 (1997). Accordingly, we conclude that account no. 2559 is not a joint asset and should not be included in the bankruptcy estate.

## II.
## A.

The Trustee argues that Anne 's ownership of the Craigs' residence resulted from the James's fraudulent transfer of assets to Anne, and, therefore, either the real estate or its equivalent in value should come into the bankruptcy estate. The Craigs respond that a fraudulent transfer did not occur because the transactions leading to Anne's ownership of the residence did not constitute a transfer of James's assets under North Dakota's codification of the Uniform Fraudulent Transfer Act, N.D. Cent. Code ch. 13-02.1 (1997).[1]

---

[1]Section 548 of the Bankruptcy Code does not apply to the alleged transfer because the relevant transactions took place more than one year before James filed

The Uniform Fraudulent Transfer Act provides that a transfer is fraudulent as to present creditors if the debtor made the transfer with actual intent to hinder, delay, or defraud creditors, or made the transfer without receiving a reasonably equivalent value in exchange. See N.D. Cent. Code § 13-02.1-04. The bankruptcy court found ample evidence that the transactions relating to the residence involved both an actual intent to defraud and a lack of reasonable consideration. Nevertheless, the bankruptcy court held that the Trustee could not reach the residence because the transactions did not constitute a transfer of an identifiable asset. The bankruptcy court assumed that the only assets which could have been transferred were the residence itself or the $67,000 paid to the  previous owners of the property by First Security State Bank. The bankruptcy court reasoned that because James never actually possessed either of these assets, he could not be said to have transferred them.

In its analysis, the bankruptcy court defined the term "transfer" too narrowly. The Uniform Fraudulent Transfer Act defines "transfer" broadly to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." N.D. Cent. Code § 13-02.1-01(12).

Under this definition, the bankruptcy court erred in its assumption that the residence or the $67,000 were the only assets which could have been transferred. The residence and the money were the only assets transferred in the limited sense that the previous owners completely surrendered ownership of the assets. Security State Bank paid the $67,000 to the sellers of the real estate, and the sellers gave Anne title to the residence. A party, however, need not surrender ownership in an asset in order to effectuate a transfer. Transfer, as defined under the Uniform Fraudulent Transfer Act, can be the grant of an interest in an asset, including the "creation of a lien or other

for bankruptcy. See 11 U.S.C. § 548(a).

encumbrance." N.D. Cent. Code § 13-02.1-02. James made a direct transfer to Carrington Health within the meaning of the statute when he allowed an encumbrance to be placed on his promissory note for the sale of his practice and delivered the note to Carrington Health.

James's transfer to Carrington Health, however, was not a fraudulent transfer because it did not diminish James's estate. Rather, Carrington Health secured James's debt to Security State Bank to the same extent that the note secured Carrington Health's liability to Security State Bank. Because of Carrington Health's guarantee, the bank loaned $82,000. In National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178 (1912), the Supreme Court reasoned that, in analyzing a transfer, courts should look at the effect of the transfer and not the circuity of the arrangement. Id. at 184. The effect of James's transfer to Carrington Health was that he obtained the right to the disbursement of a loan in an amount proportional to the encumbrance placed on his $82,053 promissory note. In other words, James received an interest in assets which was reasonably equivalent in value to the interest he transferred to Carrington Health.

This, however, does not complete our inquiry. James's transactions with Carrington Health and Security State Bank yielded him a valuable property interest, a loan of $82,000. Rather than receive the loan in a cash payment, James directed the bank to pay $67,000 to the owners of the residence and to pay the remainder into the Craigs' Super NOW account. In turn, the homeowners deeded the residence to Anne.

James allocated his interest in an asset to pay for a house and have it placed in his wife's name. While the North Dakota state courts have not addressed such an arrangement, federal courts have held that fraudulent conveyances occurred in instances where a debtor's assets were used to acquire property in the name of the debtor's relatives.

Applying New Mexico state law, the Tenth Circuit, in <u>Atlas Corporation v. DeVilliers</u>, 447 F.2d 799 (10th Cir. 1971), <u>cert. denied</u>, 405 U.S. 933 (1972), held that a debtor fraudulently conveyed assets to his children where the debtor assigned mining leases to a corporation in return for the issuance of original corporate stocks being issued to the debtor's children.  <u>Id.</u> at 806.  Addressing a similar set of transactions, a federal district court, applying federal law, reasoned,

> The fact that the stock was issued by the corporation to the wife and daughter in return for funds invested by the bankrupt works no change in the transaction which stands as if the stock had originally been issued to the bankrupt and voluntarily transferred by him to his wife and daughter. A person may not do by indirection what he is forbidden to do directly.

<u>Merriam v. Venida Blouse Corp.</u>, 23 F.Supp. 659, 661 (S.D.N.Y. 1938).  In this case, the Trustee could have avoided a transaction in which James purchased the real estate and subsequently placed the property in Anne's name.  By instead signing a note for funds which were disbursed to the seller to pay for property conveyed to Anne, James merely altered the form and not the substance of the transaction.[2]

Although the above cases were decided under fraudulent conveyance laws different than North Dakota's current statutory provisions, we believe the broad definition of transfer under the Uniform Fraudulent Transfer Act would likewise encompass a transaction such as that before us, with James signing a note for loan proceeds distributed to a seller conveying property to Anne.  The Uniform Fraudulent Transfer Act defines transfer to include both "direct and indirect" modes of parting with

---

[2]In addition to these federal cases, several state courts have have held that a husband's purchase of real estate in his wife's name is a fraudulent conveyance as to the husband's creditors and that the property is available for the payment of the husband's debts.  <u>See</u>, <u>e.g.</u>, <u>Conrad v. Diehl</u>, 129 S.W.2d 870, 878 (Mo. 1939); <u>Davis v. Yonge</u>, 85 S.W. 90, 91 (Ark. 1905); <u>Berry v. Berry</u>, 24 A. 957, 957-58 (Me. 1892).

an asset or interest in an asset. An indirect transfer occurs when the debtor surrenders an asset or interest to a third party for the ultimate benefit of the alleged transferee. See Kellogg v. Blue Quail Energy, Inc. (In the Matter of Compton Corp.), 831 F.2d 586, 591-92 (5th Cir. 1987), on rehearing, 835 F.2d 584 (1988) (interpreting similarly worded definition of transfer under 11 U.S.C. § 101(50)(Supp. V 1987)).

In Kellogg, the Fifth Circuit held that an indirect transfer existed where the debtor granted a bank a greater interest in the debtor's assets in return for the bank's issuance of a letter of credit to one of the debtor's unsecured creditors. Id. at 594-95. The court concluded that the trustee could recover from the indirect transferee regardless of whether the direct transfer to the bank was itself legitimate. Id. In its analysis, the Fifth Circuit recognized that historically "[t]he term 'transfer' as used in the various bankruptcy statutes through the years has always been broad enough to cover such indirect transfers and to catch various circuitous arrangements." Id. at 592.

James's allocation of funds for the residence fits comfortably within the definition of indirect transfer set forth in Kellogg. James directly transferred his interest in most of the loan monies to the sellers of the real estate. His admitted purpose, however, was to give Anne title to the real estate and thereby shield the asset from his creditors.

The definition of transfer under the Uniform Fraudulent Transfer Act is nearly identical to the definition provided in the Bankruptcy Code and interpreted in Kellogg. Compare N.D. Cent. Code § 13-02.1-01(12) with 11 U.S.C. § 101(54). The similarity in definitions has been viewed as an intentional effort to bring state fraudulent transfer law into conformity with federal bankruptcy law. See 5 Collier on Bankruptcy ¶ 548.02[1][a] (Lawrence P. King ed., 15th ed. 1998). Accordingly, we believe, if faced with the issue, the Supreme Court of North Dakota would conclude that a debtor's payment for property placed in the name of the debtor's spouse would fall within the definition of transfer under North Dakota's fraudulent transfer laws.

The only wrinkle that this case presents is the fact that James never physically possessed the loan proceeds before they were transferred to the sellers of the residence. The Uniform Fraudulent Transfer Act, however, does not require that the debtor physically possess the asset. Rather, the Act states that a transfer may not be made until the debtor has acquired "rights in the asset transferred." N.D. Cent. Code § 13-02.1-06.4. James acquired rights to the amount of the loan at the time that he and the bank signed the loan documents. We do not believe the North Dakota Supreme Court would read an additional physical possession requirement into the statute, particularly where such a requirement would thwart the overall purposes of the Uniform Fraudulent Transfer Act. We therefore hold that James's allocation of the loan funds to pay for the residence was an indirect fraudulent transfer to Anne and that the Trustee accordingly has the same power to reach the property as he would if the property had been placed in James's name.

**B.**

The Trustee argues that the bankruptcy court erred in determining that the residence qualifies as James's homestead. The Trustee raises several challenges both to James's ability to claim a homestead exemption and to the significance of a homestead exemption. However, it would be premature for this court to address these issues. James has not claimed a homestead exemption and, in fact, has claimed an "in lieu of homestead" exemption. Further, the bankruptcy court's discussion of the homestead exemption issue assumed that James's only interest in the residence was "mere occupancy." James suggests in his brief that, if the residence is included in the estate, he will amend his petition to claim the exemption. We therefore remand to the bankruptcy court to allow James the opportunity to do so and to allow the bankruptcy court to address the homestead exemption in the proper context.

In conclusion, we affirm the district court's decision as to Anne's savings account, reverse the district court's decision as to the residence and remand to the

bankruptcy court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT