No. 87,804

McCain Foods USA, Inc., *Appellee*, v. Central Processors, Inc., *et al.*, *Defendants*, and Glen Shore, *Appellant*.

61 P.3d 68

Opinion filed December 20, 2002.

*Mark J. Lazzo*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, argued the cause and was on the briefs for appellant.

*W. Thomas Gilman*, of Redmond & Nazar, L.L.P., of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This first impression case arises under the Uniform Fraudulent Transfer Act (UFTA), K.S.A. 33-201 *et seq*. Initially, there were several defendants, but only Glen Shore remains. The issues on appeal are crafted by the parties from two judgments entered below. The plaintiff, McCain Foods USA, Inc., (McCain) was granted partial summary judgment under K.S.A. 33-205(b) in the amount of $124,495 and permitted to assert a punitive damage

claim against Shore. The case then proceeded to trial under K.S.A. 33-204(b). After a bench trial, McCain was granted judgment in the same amount ($124,495) based on the same money transfers involved in the summary judgment motion. The trial court also awarded McCain $20,000 in punitive damages.

The judgment entered against Shore in the bench trial, based on an actual intent to defraud, is the focus of our analysis on appeal. Because we affirm the bench trial judgment, we need not review the K.S.A. 33-205(b) partial summary judgment ruling in order to resolve the dispute between the parties.

The cardinal issue on appeal is whether the trial court correctly applied UFTA to the facts here. Shore claims the trial court erred in finding: (1) the existence of K.S.A. 33-204(b) badges of fraud; (2) the transfers violated K.S.A. 33-204; and (3) the transfers made to the bank were voidable, although Shore claimed he took in good faith and for a reasonably equivalent value under K.S.A. 33-208(a).

Shore's contentions test the sufficiency of the evidence. Was the evidence of fraud clear and convincing, and did the trial court's findings support its conclusions of law? Our affirmance of the judgment granted to McCain reflects a "yes" answer to both questions.

Neither the authority of the trial court to award punitive damages under UFTA nor the amount of the punitive damage award is an issue on appeal. During oral argument, the parties agreed that the punitive damage award either remains or falls with our ruling on the principal damage award.

Our jurisdiction is under K.S.A. 20-3018(c) (transfer from Court of Appeals on our own motion).

## FACTS

This case involves a web of interconnected individuals, companies, and transactions. A citation of the underlying facts is necessary to supply the background which has shaped the parties' conflicting claims.

McCain brought an action seeking payment for its contract with Allen Quality Foods, Inc., (Allen Foods). In April 1998, Allen Foods obtained a United States Department of Agriculture (USDA) contract to deliver cases of potato wedges to various lo-

cations between July 1 and July 31, 1998. McCain contracted with Allen Foods to process and deliver cases of potato wedges under the USDA contract less a one percent commission. McCain performed its obligations under the contract. Allen Foods was required to pay McCain $351,960, the amount it received from the USDA less the retained one percent commission. In January 1999, Allen Foods paid $113,625 and stalled payment on the remaining $238,335 owing under the contract. In April 1999, McCain received a check for $125,000 from Central Processors, Inc., (Central Processors) (a company with the same officers and directors as Allen Foods) along with a letter explaining that the remaining amount would be paid by April 30, 1999.

In its summary judgment ruling, the trial court made extensive findings of fact. Shore adopts these findings as his statement of facts on appeal. We include the relevant summary judgment and the additional factual findings made by the trial court after the bench trial.

The trial court's summary judgment ruling included the following findings:

"10. The $125,000.00 check was returned to McCain with a stamp indicating payment was stopped.

"11. McCain made further demands for payment of the funds owed to it, but Allen [Foods] failed or refused to pay the sums owed of $238,345.00 ($241,890.00 less a 1% commission).

"12. McCain sued Allen in the Eighteenth Judicial Circuit, County of Du Page, in the State of Illinois, Case No. 99 L 549. On July 19, 1999, that court entered default judgment in favor of McCain against Allen in the amount of $238,335.00.
. . .

"13. McCain's Illinois judgment against Allen was registered in the Sedgwick County, Kansas, District Court, Case No. 99 C 2574, on August 24, 1999 pursuant to the Uniform Enforcement of Foreign Judgments Act.

"14. Allen and Central [Processors] operated from the same premises, 1200 North Mosely, Wichita, Kansas. Allen and Central had common officers and directors. Allen was in the business of brokering contracts with the government, primarily the USDA. Allen began business operations in approximately July of 1998. Allen stopped operating in the first quarter of 1999. During the period from July 1998 through July 1999, the officers at Allen were as follows: Walter Ewing, President; Percy King, Vice President; Ann King, Secretary/Treasurer; and Shore, Assistant Secretary. From July 1998 through July 1999, the Allen's [sic] directors were Walter Ewing, Percy King, Ann King, Bill Vanderhoff, and Shore.

"15. Central was in the business of producing processed meat. Allen and Central had a working relationship. Central provided Allen with the meat that Allen was providing to the USDA pursuant to its contracts with the USDA. Central began business operations in September 1998. Central stopped producing processed meat in February, 1999. Central continued to collect receivables from its processed meat operation into March of 1999. During the period from September 1998 through July of 1999, Central's officers were: Walter Ewing, President; Shore, Vice President; Ann King, Secretary/Treasurer; and Shore, Assistant Secretary. During the period from September 1998 through July 1999, Central's directors were Walter Ewing, Percy King, Ann King, Bill Vanderhoff and Shore, plus another person Shore could not recall in his deposition. Central operated from the premises at 1200 North Mosely from September 1998 through February 1999.

"16. Shore provided financial backing to Allen and Central. He loaned money directly to Allen and/or Central and guaranteed leases and loans that were made to Central or Allen. One of the loans Shore guaranteed was made by Intrust Bank (Intrust). Neither Allen nor Central provided collateral for the loan. Intrust's security for the loan was Shore's guarantee.

"17. The loan Intrust made to Allen and/or Central became due in June or July of 1999. In addition, the loan Shore made to Central and/or Allen became due in January of 1999. It was not paid when it became due in January of 1999.

"18. During the period from April 1999 through July 1999, Allen was not paying its debts as they became due.

"19. During the period from April 1999 through July 1999, Central was not paying its debts as they became due.

"20. During the period from April 1999 through July 1999, the value of Allen's assets was $5,000.00 to $6,000.00, at most.

"21. On April 19, 1999, Allen transferred $120,000.00 via telephone transfer to Central. There was no consideration for the transfer.

"22. On June 3, 1999, Allen paid Shore $45,000.00 . . . . The payment from Allen to Shore was to repay Shore for a loan Shore made to Allen on approximately April 18, 1999. On May 4, 1999, Allen paid Intrust $25,000.00 . . . . The payment by Allen to Intrust was on an obligation that Shore had previously guaranteed. Had Allen not paid Intrust, Shore would have been responsible for paying that amount to Intrust. On July 15, 1999, Allen paid Intrust $4,495.00 . . . . The payment was to Intrust on an obligation that Shore had previously guaranteed. Had Allen not paid Intrust, Shore would have been responsible for paying that amount to Intrust. On May 10, 1999, Central paid Intrust $50,000.00 . . . . The payment by Central to Intrust was on an obligation that Shore had previously guaranteed. Had Central not paid Intrust, Shore would have been responsible for paying that amount to Intrust.

"23. On behalf of Allen, Shore issued the stop payment order on [a check] in the amount of $125,000.00 that Allen issued on April 15, 1999 to McCain . . . .

"24. Shore was one of the authorized signators on all of the checks described in paragraph 22, above. During the period from April 1999 through July 1999, Shore was one of the persons that signed most of the checks of $500.00 or more issued by Allen and Central.

"25. At all times relevant, Allen was a company that was primarily involved in brokering contracts with the government for production or processing of food. Central was the company that was primarily responsible for the production or processing of the food necessary to fulfill the contracts brokered by Allen.

"26. Because Allen was primarily involved in brokering food contracts, the company did not have significant hard assets. The only physical assets needed by Allen to operate were office equipment.

"27. Central, as the company primarily responsible for the production and processing of the food necessary to fulfill the contractual obligations of Allen, owned most of the physical assets needed for the production and processing of food. In addition, Central would incur all of the costs of production, which were substantial. Such costs included labor costs, costs of raw materials, the cost of obtaining and maintaining the processing equipment, transportation costs, and utility costs.

"28. Central would customarily take a commission of 3 to 4% of the profits of contracts obtained by Allen to cover the costs of production. The percentage that was appropriate for this commission was the subject of several discussions between the officers and directors of Allen and Central.

"29. Shore joined Allen and Central pursuant to a January 1, 1998, agreement with both companies. Pursuant to the terms of the agreement, as Shore understood it, Shore made loans of approximately $50,000.00 and leased $50,000.00 of equipment necessary for Central to produce and process the food necessary to enable Allen to pursue government contracts. Shore was told that all other matters essential to a successful operation were in place, including but not limited to, financing arrangements to secure raw materials, credit arrangements for outbound transportation, all licenses and inspections required by the government, and that both Allen and Central had been approved as minority/disadvantaged government contractors.

"30. It was Shore's understanding that the loans and leases described above were to be paid off within the first year, or by January of 1999. Both Allen and Central used the funds Shore advanced.

"31. By March of 1998, Shore learned that many of the representations that had been made to him regarding the ability of Allen and Central to begin operations were not true. The companies had not been approved as minority/disadvantaged government contractors, nor had the required licenses been obtained. Further, Gregory Allen left both Allen and Central taking with him a number of files containing corporate records and information. At this time, Shore was made a vice president and the secretary treasurer of both Allen and Central.

"32. Shore arranged for a line of credit for $25,000.00 to be paid back from the first proceeds of any contract. In addition, Shore pushed to get the companies the licenses required, and to get them approved as minority/disadvantaged gov-

ernment contractors. The licenses were obtained. In July of 1998 Allen obtained its first contract to process and package roasts for the United States Department of Agriculture. However, the companies were again short of funds to be able to perform this contract, so Shore arranged for an additional $25,000.00 to be added to the line of credit so that the companies could begin production.

"33. Percy King, Jr. advised Shore that he had made an arrangement with Dan Phillippi for the purchase of raw materials. Mr. King advised Shore that the agreement was between he and Mr. Phillippi for the benefit of Allen and Central. Shore subsequently learned that the agreement was very one-sided in favor of Mr. Phillippi, but there was no other alternative in place for the companies to secure raw materials. In addition, Shore learned that Mr. King had not read, or did not understand, the requirements of the July contract regarding the packaging specifications. Thus, in order for Allen to fulfill its obligations on the July contract with the USDA, additional equipment costing approximately $35,000.00 was required. Shore felt that there was no choice but to lease the equipment, which required that Shore guarantee the lease payments.

. . . .

"44. Shore discussed stopping payment on the McCain check, since no one seemed to know of significant amounts of money coming into the company. Mr. Ewing made no objections to this course of action.

"45. Shore then confirmed that the McCain check had not cleared the bank. Since no one had any explanation regarding where this money came from, and no one could produce a copy of the McCain contract or explain why Allen owed McCain any money, Shore stopped payment on the check."

After the bench trial, the trial court made the following findings of fact and conclusions of law:

"The court granted McCain partial summary judgment on March 8, 2001 on McCain's claim against Shore pursuant to K.S.A. 33-205(b). In granting summary judgment, the court found that there were uncontroverted facts that establish two of the badges of fraud under K.S.A. 33-204(b). Those badges are:

"(1) The transfer or obligation was to an insider; and

"(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

"The uncontroverted facts established that Shore was an insider to both Allen and Central and that both Allen and Central were insolvent on the dates Shore transferred funds to himself or for his benefit. Those facts were also established at trial by clear and convincing evidence.

"At trial, McCain established by clear and convincing evidence, four additional badges of fraud. They are as follows:

"1. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

"The evidence is uncontroverted that on May 27, 1999, Shore was served with process on behalf of Allen in the Illinois collection action brought by McCain against Allen. Shore's testimony was that he had stopped payment on the $125,000.00 sent to McCain by Allen a few weeks before he was served with process in the Illinois collection action because he could not verify that McCain's indebtedness was actually due by Allen. Nevertheless, within days after Allen was sued by McCain for the indebtedness in question (clear verification that McCain made some type of claim against Allen), Shore transferred nearly $50,000.00 directly to himself or for his benefit.

"Moreover, there was evidence presented through Percy King and Anne [*sic*] King that they both informed Shore that the indebtedness owed by Allen to McCain was legitimate and that Shore should not have stopped payment on the $125,000.00 Allen sent to McCain. There was evidence that Shore made no effort whatsoever to contact McCain to verify the indebtedness. Shore had the opportunity to contact McCain to verify the indebtedness after he had been served with process in the Illinois lawsuit. Shore's reason for stopping payment on Allen's check to McCain is inconsistent with his conduct; but his conduct is consistent with an intent to defraud.

"The badge of fraud at K.S.A. 33-204(b)(4) has been established by clear and convincing evidence.

"2. *The transfer was of substantially all the debtor's assets.*

"At trial, the evidence indicated that virtually all of Allen's funds in its only checking account were transferred to Shore or for his benefit during the period from April 1999 through August 1999 when Shore was in control of that business. Moreover, the evidence showed that the largest check issued by Central during the same time frame was for Shore's benefit when he controlled that company. After transferring these assets to or for his benefit, there were no funds available for payment of other unsecured creditors of the companies including, but not limited to McCain.

"The badge of fraud at K.S.A. 33-204(b)(5) has been established by clear and convincing evidence.

"3. The transfer or obligation was concealed and the debtor removed or concealed assets.

"Having been served with process in the Illinois collection action, Shore transferred nearly $50,000.00 to himself or for his benefit. Shore made no effort to contact McCain to explain Allen's financial situation. Instead, as the Allen/Central ship was sinking, Shore inflated the companies' only life raft and saved himself, leaving remaining creditors to drown. There was no effort by Shore to disclose the transfers he was making to himself or to involve McCain or other unsecured creditors in an orderly liquidation of the companies' assets.

"Moreover, while Shore denies that he authorized the $120,000.00 wire transfer on April 19, 1999 from Allen to Central, he admits that he stopped payment on McCain's $125,000.00 check issued only days before, and then utilized $50,000.00 of the funds transferred to pay himself. No one at Allen admits to having made

the transfer, which was for no consideration. However, the evidence indicates that Shore was one of the persons that was in control of the businesses at the time the transfer was made and Shore undeniably utilized a large portion of those funds to pay himself. The only person that had the motive and the authority to make that transfer was Shore and the court finds that he made the transfer.

"This transfer was similarly not disclosed to McCain though Shore stopped payment on Allen's $125,000.00 check to McCain shortly before the transfer. Thus, McCain has established by clear and convincing evidence the badges of fraud under K.S.A. 33-104(b)(3) and (7).

"The badges of fraud set forth in K.S.A. 33-204(b)(2)(8) and (11) are not applicable in this case. The property transferred was money, as opposed to a physical asset. Therefore, these sections are inapplicable.

"McCain has established by clear and convincing evidence the badges of fraud set forth at K.S.A. 33-204(b)(1), (3), (4), (5), (7) and (9). Of the five that have not been established, two are inapplicable in the context of this case. Although there is no law in Kansas construing UFTA, courts have held that when several badges of fraud are established under UFTA, a presumption or inference of fraud arises. [Citing *Fleming Companies, Inc. v. Rich*, 978 F. Supp. 1281, 1297-98 (E.D. Mo. 1997); *Gilchinsky v. National Westminster Bank*, 732 A.2d 482, 489-90 (N.J. 1999); *General Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498-99 (11th Cir. 1997 (applying Florida's UFTA); and *F.D.I.C. v. Anchor Properties*, 13 F.3d 27, 32 (1st Cir. 1994) (applying Massachusetts law.)]

"Inasmuch as McCain has established six of the eleven badges of fraud set forth in K.S.A. 33-204(b) and two of the five badges that have not been established are inapplicable in the context of this case, a presumption arises that Shore defrauded McCain.

"K.S.A. 60-3702(c) requires that fraud be established by clear and convincing evidence. Here McCain has established enough of the badges of fraud to raise a presumption or inference of fraud. Shore has not rebutted the presumption or inference. The court was not persuaded by Shore's testimony in his case in chief. Fraud has been established by clear and convincing evidence.

"McCain presented evidence of Shore's gross income in the five years preceding the conduct of which McCain complains. Considering the criteria set out at K.S.A. 60-3702(b), the court finds that Shore acted toward McCain with willful conduct and fraud and that McCain should be granted a judgment against Shore for punitive damages in the amount of $20,000."

## DISCUSSION

Brief references to UFTA's concept and its arrival in Kansas are in order. In 1998, the Kansas Legislature enacted UFTA, K.S.A. 33-201 through K.S.A. 33-212, with an effective date of January 1, 1999. L. 1998, ch. 13, secs. 1-12. For UFTA background and overview, see Graves, *The Kansas Uniform Fraudulent Transfer Act*,

68 J.K.B.A. 34 (June/July 1999). UFTA is aimed at protecting unsecured creditors in situations where the debtor manipulates property to defeat the creditors' interests. Committee Reports to the 1997 Kansas Legislature, pp. 2-7 (1996).

UFTA creates a right of action for any creditor against any debtor and any other person who has received property from the debtor in a fraudulent transfer. A fraudulent transfer occurs when a debtor intends to hinder, delay, or defraud a creditor, or transfers property under certain conditions to another person without receiving reasonably equivalent value in return. See K.S.A. 33-204. K.S.A. 33-204(b) sets out 11 nonexclusive badges of fraud to be considered in determining actual intent under K.S.A. 33-204(a)(1).

Among the various remedies provided by UFTA is avoidance of the transfer or obligation to the extent necessary to satisfy a creditor's claim. K.S.A. 33-207(a)(1) (the remedy selected by McCain here). To the extent a transfer is voidable, a creditor may recover judgment for the value of the asset transferred or the amount necessary to satisfy the claim, whichever is less. K.S.A. 33-208(b). Judgment may be entered against a transferee of the asset or the person for whose benefit the transfer was made. K.S.A. 33-208(b)(1).

### K.S.A. 33-204

The trial court voided four transfers collectively totaling $124,495, the amount of the principal damage judgment entered in favor of McCain. Three of the transfers were to pay off loans Shore had guaranteed:

(1) May 4, 1999, Allen Foods paid Intrust Bank $25,000;

(2) May 10, 1999, Central Processors paid Intrust Bank $50,000;

(3) July 15, 1999, after Shore had been served in the Illinois collection action, Allen Foods paid Intrust Bank $4,495.

The fourth transaction occurred June 3, 1999. Six days after being served with the summons and complaint in the Illinois collection action, Allen Foods paid Shore $45,000 to repay Shore for a loan he had made to Allen Foods on April 18, 1999.

Shore contends the trial court erred in finding that 6 of the 11 K.S.A. 33-204(b) statutory badges of fraud applied to him. Accord-

ing to Shore, each of the four transfers must be analyzed individually to determine fraudulent intent. Shore also reasons that he is entitled to a defense under K.S.A. 33-208(a) because he took the transfers in good faith and for a reasonably equivalent value. We now undertake a discussion of each of Shore's claims.

K.S.A. 33-204(a) provides:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

"(1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

"(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that such debtor would incur, debts beyond such debtor's ability to pay as they became due."

K.S.A. 33-204(b) contains a nonexclusive list of badges of fraud that may be considered in determining fraudulent intent under the actual fraud provision, K.S.A. 33-204(a)(1). (The trial court found the badges of fraud in bold type to apply here. The three in italics did not apply under the facts. The italicized badges concern transfers of physical assets as opposed to transfers of money. Although not specifically mentioned in the trial court's opinion, it appears McCain did not prove [6] and [10], the two badges in plain type.) The statutory badges are:

"(1) **The transfer or obligation was to an insider;**

"(2) *the debtor retained possession or control of the property transferred after the transfer;*

"(3) **the transfer or obligation was disclosed or concealed;**

"(4) **before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;**

"(5) **the transfer was of substantially all the debtor's assets;**

"(6) the debtor absconded;

"(7) **the debtor removed or concealed assets;**

"(8) *the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;*

"(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

"(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

"(11) *the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.*"

At the bench trial, Walter E. Ewing, Percy King, Ann King, and Shore testified during McCain's presentation of its case. Shore was the only witness in his case in chief. The trial court, after reviewing the testimony, the exhibits introduced at trial, written briefs, and arguments of counsel, ruled for McCain.

Our standard of review instructs us to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 747, 27 P.3d 1 (2001). Our review of the trial court's conclusions of law is unlimited. *Lindsey v. Miami County National Bank*, 267 Kan. 685, 689-90, 984 P.2d 719 (1999). We do not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 387, 22 P.3d 124 (2001).

Although there is no Kansas case construing UFTA, cases decided before UFTA's adoption are instructive in recognizing the connection between badges of fraud and the proof necessary to support a finding of fraud. See *Mohr v. State Bank of Stanley*, 244 Kan. 555, 568-70, 770 P.2d 466 (1989); *City of Arkansas City v. Anderson*, 243 Kan. 627, 632-38, 762 P.2d 183 (1988), *cert. denied* 490 U.S. 1098 (1989); *Koch Engineering Co. v. Faulconer*, 239 Kan. 101, 716 P.2d 180 (1986).

In *Koch Engineering*, we outlined the legal relationship which exists between the badges of fraud and the elements of a fraudulent conveyance. We said:

" 'While some courts, without purporting to set forth an exhaustive list, have enumerated many of the more common badges of fraud, the possible indicia of

fraud are so numerous that no court could undertake to anticipate and catalog them all . . . .' [37 C.J.S., Fraudulent Conveyances § 79.]

"The general rule is, of course, that fraud is never presumed and must be established by clear and convincing evidence. The burden of establishing fraud is upon the party asserting it. Direct evidence of fraud is not always available; more frequently fraud must be established by circumstantial evidence.

. . . .

" . . . Badges of fraud are circumstances frequently attending conveyances and transfers intending to hinder, delay, or defraud creditors. They are red flags, and when they are unexplained in the evidence, they may warrant an inference of fraud. Some are weak; others are strong. One weak badge of fraud, standing alone, would have little evidentiary value in establishing a fraudulent conveyance. . . . On the other hand, the concurrence of several badges of fraud are said to make out a strong case." 239 Kan. at 106-07.

The use of badges of fraud in testing for fraudulent intent traces its history back to the Statute of 13 Elizabeth in 1570. "English courts soon developed the doctrine of 'badges of fraud': proof by a creditor of certain objective facts would raise a rebuttable presumption of actual fraudulent intent." Graves, *The Kansas Uniform Fraudulent Transfer Act*, 68 J.K.B.A. at 36.

The Prefatory Note to the Uniform Fraudulent Transfer Act, 7A U.L.A. Part II 302 (1999) informs us:

"The English statute was enacted in some form in many states, but, whether or not so enacted, the voidability of fraudulent transfer was part of the law of every American jurisdiction. Since the intent to hinder, delay, or defraud creditors is seldom susceptible of direct proof, courts have relied on badges of fraud."

The determination of whether a creditor has proved a debtor's fraudulent intent entails a case-by-case factual examination of all relevant circumstances involving the challenged transfer or obligation. See Uniform Fraudulent Transfer Act § 4, Comment (6), 7A U.L.A. Part II 303 (1999).

Applying a case-by-case examination leads us to a review of "all relevant circumstances" here. Percy King testified: (1) Shore "knew that money was McCain's, you know, was supposed to go to McCain's Food [*sic*]"; (2) he told Shore that Shore should not have stopped payment because the money was supposed to go McCain; (3) Shore knew how much money was owed to McCain because he was told by Percy, Lori Smith, and "Mr. Ewing." Ann

King told Shore in February 1999 that "there was some monies that had been coming [in] for McCain Foods."

As noted earlier, the trial court was not persuaded by Shore's trial testimony and found that McCain had established six badges of fraud by clear and convincing evidence. See K.S.A. 33-204(b).

Other courts construing UFTA have found that when several badges of fraud are established, a presumption of fraud exists. When one or more of these badges is present, fraudulent intent can be inferred. See *In re Taylor,* 133 F.3d 1336, 1338 (10th Cir. 1998).

Three of the transfers here were made to Intrust Bank to pay off loans to Allen Foods and Central Processors guaranteed by Shore. Shore contends the district court erred in its interpretation of K.S.A. 33-205(b) in granting partial summary judgment because Intrust Bank is not an insider of either Allen Foods or Central Processors. Shore bases his argument on the plain reading of K.S.A. 33-205(b). He does not provide any authority supporting his position. He focuses on the statute's definition of insiders and argues the legislature's express reach of K.S.A. 33-205(b) is limited to direct transfers to insiders, not transfers "for the benefit" of insiders. Shore claims that if the legislature intended to expand the reach of K.S.A. 33-205(b) to include payments "for the benefit" of insiders, it would have said so.

McCain contends Shore's K.S.A. 33-205(b) argument misses the mark because it does not account for the definition of transfers as defined by K.S.A. 33-201(l). According to McCain, the definition of transfers is not limited to the payee on a check if there is an indirect payment to another person, such as an insider who is also a guarantor.

We need not interpret K.S.A. 33-205(b) to decide this case. We are reviewing a bench trial judgment under K.S.A. 33-204(b). However, the parties' conflicting positions on the definition of "transfer" under K.S.A. 33-201(l) play a role in our discussion of the bench trial judgment.

A review of the bench trial leads us to Shore's contention, raised for the first time on appeal, that the trial court erred in making no effort to consider the four transfers separately. According to Shore,

each transfer is different factually and legally; thus, an individual transfer analysis under K.S.A. 33-204(b) was required. We disagree. Shore cites no authority requiring an individual transfer analysis. We agree with the Tenth Circuit Court of Appeals' observation concerning an appellate position which has not been minimally supported by legal argument or authority: " 'A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.' " *Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir. 1992) (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 [7th Cir. 1990]). Simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue. "Where the appellant fails to brief an issue, that issue is waived or abandoned. [Citation omitted.]" *Bergstrom v. Noah*, 266 Kan. 847, 873, 974 P.2d 531 (1999). Neither the pretrial order nor the trial transcript reflects that the trial court was alerted to Shore's individual analysis claim. Issues not raised before the trial court cannot be raised on appeal. See *Dalmasso v. Dalmasso*, 269 Kan. 752, 765, 9 P.3d 551 (2000). Three of the transfers, totaling $120,000 of the judgment, occurred in less than a 30-day period. The trial court could have considered the transfers as a continuing scheme to hinder, delay, or defraud McCain.

K.S.A. 33-201(l) defines "transfer" as "every mode, *direct or indirect,* absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." (Emphasis added.)

Shore agrees that although he is an insider as defined in K.S.A. 33-201(g)(2), Intrust Bank is not. Shore reasons the transfers to the bank were not transfers to an insider and thus the K.S.A. 33-204(b)(1) badge of fraud, transfer to an insider, does not apply. Shore fails to adequately consider UFTA's definition of transfer. The definition of transfer is sufficiently broad under the facts here to include the indirect transfers from Allen Foods or Central Processors to Intrust Bank to pay Shore's loan guarantees. On May 4, 1999, Allen Foods, through a check signed by Shore, transferred

$25,000 to Intrust Bank. On May 10, 1999, Central Processors, through a check signed by Shore, transferred $50,000 to Intrust Bank. On June 3, 1999, Allen Foods, through a check signed by Shore, paid Shore $45,000. On July 15, 1999, Allen Foods, through a check signed by Shore, transferred $4,495 to Intrust Bank. The payments to the bank were applied on debts that Shore had guaranteed. On each of the above dates, Shore was an officer and director of both Allen Foods and Central Processors. Moreover, Shore, as found by the trial court at the bench trial, was in control of both companies during this time frame.

A transfer as defined by K.S.A. 33-201(l) does not limit the scope of K.S.A. 33-204(b)(1) only to direct transfers to insiders. Due to the broad scope of UFTA, the legislature did not intend that an insider escape liability through a circuitous arrangement to avoid liability under UFTA.

We find support for our analysis in *In re Craig*, 144 F.3d 587 (8th Cir. 1998). *Craig* is a bankruptcy case. However, the North Dakota Uniform Fraudulent Transfer Act comes into play because the relevant transactions took place more than a year before Dr. James Craig, the debtor, filed for bankruptcy. Craig directed that loan funds from the bank be used to pay the sellers for a residence titled in his wife's name. *Craig* held that an indirect fraudulent transfer was made to Craig's wife. (The North Dakota statute construed in *Craig*, N.D. Cent. Code § 13.02.1-01(12) (1997), is identical to K.S.A. 33-201[l]). The *Craig* court said:

"[T]he broad definition of transfer under the Uniform Fraudulent Transfer Act would likewise encompass a transaction such as that before us, with James signing a note for loan proceeds distributed to a seller conveying property to Anne [James' wife]. The Uniform Fraudulent Transfer Act defines transfer to include both direct and indirect modes of parting with an asset or interest in an asset. An indirect transfer occurs when the debtor surrenders an asset or interest to a third party for the ultimate benefit of the alleged transferee. *See Kellogg v. Blue Quail Energy, Inc. (In the Matter of Compton Corp.)*, 831 F.2d 586, 591-92 (5th Cir. 1987), *on rehearing*, 835 F.2d 584 (1988) (interpreting similarly worded definition of transfer under 11 U.S.C. § 101(50) (Supp. V 1987)).

"In *Kellogg*, the Fifth Circuit held that an indirect transfer existed where the debtor granted a bank a greater interest in the debtor's assets in return for the bank's issuance of a letter of credit to one of the debtor's unsecured creditors. *Id.* at 594-95. The court concluded that the trustee could recover from the indirect

transferee regardless of whether the direct transfer to the bank was itself legitimate. *Id.* In its analysis, the Fifth Circuit recognized that historically '[t]he term "transfer" as used in the various bankruptcy statutes through the years has always been broad enough to cover such indirect transfers and to catch various circuitous arrangements.' *Id.* at 592.

"James's allocation of funds for the residence fits comfortably within the definition of indirect transfer set forth in *Kellogg*. James directly transferred his interest in most of the loan monies to the sellers of the real estate. His admitted purpose, however, was to give Anne title to the real estate and thereby shield the asset from his creditors.

"The definition of transfer under the Uniform Fraudulent Transfer Act is nearly identical to the definition provided in the Bankruptcy Code and interpreted in *Kellogg*. Compare N.D. Cent. Code § 13-02.1-01(12) *with* 11 U.S.C. § 101(54). The similarity in definitions has been viewed as an intentional effort to bring state fraudulent transfer law into conformity with federal bankruptcy law. See 5 Collier on Bankruptcy ¶ 548.02[1][a] (Lawrence P. King ed., 15th ed. 1998)." 144 F.3d at 592-93.

As to bankruptcy preference claims against guarantors based on payments made on the principal obligation as an indirect benefit to a guarantor, the basic issue was addressed years ago in *Smith v. Tostevin*, 247 F. 102 (2d Cir. 1917). An individual debtor paid his bank loan 1 week prior to the filing of his bankruptcy petition. The bank then released certain stock that the debtor's wife had pledged as security for the loan. The Second Circuit, speaking through Judge Learned Hand, reversed the dismissal of the bankruptcy trustee's suit against the wife, holding that the debtor's payment to the bank was a voidable preference to the wife, reasoning as follows: "A payment to the creditor discharges him, therefore, precisely as though made directly to him. Hence it was inevitable that such a payment should be held a preference, whether made to the innocent creditor or to the surety; the effect was identical, whichever course was chosen." 247 F. at 103.

The trial court, in granting summary judgment for McCain, found that the K.S.A. 33-204(b)(9) badge of fraud, "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred," applied. After the bench trial, the court said: "The uncontroverted facts established that Shore was an insider to both Allen and Central and that both Allen and Central were insolvent on the dates Shore transferred funds to himself

or for his benefit. Those facts were also established at trial by clear and convincing evidence." The record supports the trial court's bench trial finding.

We also agree that the trial court's findings of additional K.S.A. 33-204(b) badges of fraud, (1) before the transfer was made or the obligation incurred, the debtor had been sued or threatened with suit; (2) the transfer was of substantially all the debtor's assets; (3) the transfer was concealed; and (4) the debtor removed or concealed assets, are supported by substantial competent evidence. Our conclusion is in conformity with the long-established principle that courts will refuse to sanction acts done by indirection that if performed directly would be barred by law. See 5 Collier on Bankruptcy ¶ 547.03[1][a] (15th ed. 2002).

Shore also argues that he merely preferred one creditor, himself, over others and that his conduct is not proscribed by UFTA. The argument was not set out in the pretrial order or otherwise raised below and appears for the first time on appeal. Issues not raised before the trial court cannot be raised on appeal. *Lindsey v. Miami County National Bank*, 267 Kan. 685, 690, 984 P.2d 719 (1999.)

Finally, we consider Shore's K.S.A. 33-208(a) defense that transfers to persons who took in good faith and for a reasonably equivalent value are not voidable. Under issues of fact relating to Shore's defense, the pretrial order said: "During the period from April 1, 1999, to July 31, 1999, did the defendant Shore have reasonable cause to believe that Allen Quality Foods, Inc. and/or Central Processors, Inc. were insolvent?" McCain argues that Shore did not preserve the defense he now asserts on appeal because the agreed-to pretrial order only preserved Shore's knowledge about insolvency as an issue of fact. We agree.

"The purpose of the pretrial conference . . . is to eliminate the element of surprise from trials and to simplify the issues and procedure by full disclosure to all parties of the anticipated evidence, and factual and legal issues, and to consider '[s]uch other matters as may aid in the disposition of the action.' [K.S.A. 2001 Supp. 60-216(c)(7)]." *Burkhart v. Philsco Products Co.*, 241 Kan. 562, 570, 738 P.2d 433 (1987). The pretrial order under K.S.A. 2001 Supp. 60-216(e) controls the course of the action unless modified to pre-

vent manifest injustice. See *Herbstreith v. de Bakker*, 249 Kan. 67, 75-76, 815 P.2d 102 (1991). An issue or claim for relief that is not contained in the pretrial order should not be entertained by the trial court. See *Kleibrink v. Missouri-Kansas-Texas Railroad Co.*, 224 Kan. 437, 442, 581 P.2d 372 (1978).

In passing, we note the trial court observed: "[A]s the Allen/Central ship was sinking, Shore inflated the companies' only life raft and saved himself, leaving remaining creditors to drown." After hearing the evidence and observing the witnesses' demeanor, the trial court was convinced that McCain had proved its claim under K.S.A. 33-204(a)(1) by clear and convincing evidence.

Simply put, the trier of fact did not believe Shore's story.

Affirmed.