## MERRIAM v. VENIDA BLOUSE CORPORATION et al.

District Court, S. D. New York.
April 19, 1938.

Krause, Hirsch & Levin, of New York City (George C. Levin and Elliot L. Krause, both of New York City, of counsel), for plaintiff.

Michael I. Winter, of New York City, for defendant Joseph Brecher.

Alexander Levine, of New York City, for defendants Venida Blouse Corporation, Bertha Brecher, Fay Brecher Krass, and Leo J. Brecher.

CLANCY, District Judge.

Plaintiff, as trustee in bankruptcy, brings this action under § 70e of the Bankruptcy Act, 11 U.S.C.A. § 110(e), to set aside the alleged fraudulent transfer of 100 shares of stock. These shares represent all the outstanding stock of the

Venida Blouse Corporation, one of the defendants herein. The Venida Waist & Dress Corporation was organized in 1923 and later changed its name to Venida Dress Corporation. In 1929 it was succeeded by the Venida Blouse Corporation which took over the assets and assumed the liabilities of its predecessor and issued its stock in exchange for the stock of Venida Dress Corporation. For the purpose of this case the name Venida may be used interchangeably to denote the several corporate names mentioned. The other defendants are Joseph Brecher, the bankrupt; his wife, Bertha Brecher, to whom Venida at the time of its organization in 1923 issued 99 shares of stock; Fay Brecher Krass, the bankrupt's daughter, to whom one share was issued, and the bankrupt's son who has been in the employ of Venida. All of the defendants, except the bankrupt, appeared by one attorney and he appeared by another.

Joseph Brecher accumulated debts aggregating some $40,000 which went to judgment between November 22, 1921 and February 21, 1923. No payments have been made on account of these but the bankrupt has been living with his family in at least moderate luxury. In 1936 one of Joseph Brecher's creditors obtained an order under § 793 of the Civil Practice Act, then comparatively new, directing the bankrupt to pay $10 weekly to the creditor on a finding that he was rendering services to Venida. Payments were made pursuant to said order for a few weeks when he filed a voluntary petition in bankruptcy, wherein he gave what appears to be a false address and stated his occupation as that of steamship ticket broker, indicating a desire to conceal his identity from the business men in contact with Venida.

Venida under subpoena was unable to produce many of its pertinent books and records. The bankrupt, his wife and children, did not appear in the courtroom throughout the trial. The accountant, who had served Venida in and since its inception and the Brechers for some time prior thereto, was called as a witness, a hostile witness of course, by the trustee and he testified that he had none of the corporation books, records, tax reports or any other record pertaining to the company, nor any records of his own in reference thereto. He had, however, audited the company books monthly for a long period of years if not throughout its existence. The trustee was substantially relegated to the few records he could find consisting largely of letters, the testimony of bank officials who were certainly not unfriendly to the bankrupt and his family, the testimony of the accountant already referred to, and that of the bookkeeper who had served the corporation since 1928.

It appears from the evidence produced that the bankrupt and his wife were in business for some time up to 1919 as the J. B. Waist Co. which from all that appears may have been a corporate or a trade name. The accountant said both ran that business. That Bertha Brecher derived any earnings whatever from J. B. Waist Co. nowhere appears nor does it appear that she received one cent upon leaving it. There is no evidence of what the bankrupt received out of the J. B. Waist Co. but in 1921 he entered the private banking business. The earliest recorded judgment against him was entered November 22, 1921. This business started to liquidate in August, 1922 and early in 1923 Venida was organized.

There is no evidence anywhere in the case that the wife or daughter were employed in any gainful occupation or had any separate estates or incomes at the time Venida was organized. There was some hazy evidence that the wife purchased bonds in her own name in 1920 or 1921 but with whose money does not appear. There was also some evidence that she was employed by one Arenson in 1920 but there was nothing further offered on the point.

The bankrupt and his wife visited the accountant in 1923 and had a conference with him concerning the organization of Venida. The accountant testified that the capital stock was issued for money and the money was paid in, although he does not remember whose money it was or how much, and that they instructed him in setting up the books of the corporation. Admittedly 99 shares of stock were issued to the bankrupt's wife and 1 to his daughter who was not present at the conference mentioned.

In the absence of any evidence that the funds invested in the corporation came from the wife or daughter, or that they had any separate estates, it will be assumed that the funds which went into the business belonged to the bankrupt. Seitz v. Mitchell, 94 U.S. 580, 24 L.Ed. 179. In this case the Supreme Court

said (page 583): "In a contest between the creditors of the husband and the wife there is, and there should be, a presumption against her which she must overcome by affirmative proof," thereby applying to a transaction between husband and wife a rule firmly embedded in the law of evidence; viz., that the party who is in the best position to know the facts bears the burden of explanation. It is a rule that is applied with regularity in situations that may be said to be analogous. Thus, it is found in the doctrine of res ipsa loquitur in tort actions. "Where the instrumentality which produced an injury is within the exclusive possession and control of the person charged with negligence, and such person has exclusive knowledge of the care exercised in the control and management of that instrumentality, evidence of circumstances which show that the accident would not ordinarily have occurred without neglect of some duty owed to the plaintiff is sufficient to justify an inference of negligence and to shift the burden of explanation to the defendant." Galbraith v. Busch, 267 N.Y. 230, 196 N.E. 36, 38. And, in the law of bailments, where the property was in good condition when delivered, the onus is on bailee to show proper care of it, "Because the facts are within the defendant's peculiar knowledge, and he should, therefore, prove them." Collins v. Bennett, 46 N.Y. 490. Or, as Justice Holmes said in Moore v. New York, New Haven & Hartford Railroad Company, 173 Mass. 335, 336, 53 N.E. 816, 73 Am. St.Rep. 298, holding the last of connecting carriers must explain the damage to property delivered in good condition to the first, "[The rule] was much fortified by the argument that it was a rule of convenience, if not of necessity, like the rule requiring a party who relies upon a license to show it." And, in Wylde v. Northern R. Co. of N.J., 53 N.Y. 156, a verdict in an action on a breach of contract against two railroads was sustained against the one other than the contractor where some evidence showed a joint operation of their business and the defendants gave no evidence on the trial, the court saying: "The defendants knowing the truth and omitting to speak, every inference warranted by the evidence should be indulged against them."

The fact that the stock was issued by the corporation to the wife and daughter in return for funds invested by the bankrupt works no change in the transaction which stands as if the stock had originally been issued to the bankrupt and voluntarily transferred by him to his wife and daughter. A person may not do by indirection what he is forbidden to do directly. The issuance of the stock was a transfer of the bankrupt's property within the definition of transfer as set forth in § 1 (25) of the Bankruptcy Act, 11 U.S.C.A. § 1 (25). Pirie v. Chicago Title & Trust Co., 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171. This transfer was presumptively fraudulent under the New York Law as it stood in 1923. Cole v. Tyler, 65 N.Y. 73; Kerker v. Levy, 206 N.Y. 109, 99 N.E. 181; Ga Nun v. Palmer, 216 N.Y. 603, 111 N.E. 223.

The activities of Venida after its incorporation were not fully disclosed due to the absence of the corporate books and the knowing parties. However, it does appear that the bankrupt took an active part in the firm's affairs and devoted all his time and effort to it over a considerable period of time.

From the books it appears that the defendant, Fay Brecher Krass, received a weekly salary of $60; the defendant, Leo Brecher, the bankrupt's son, a salary of $75, and the defendant, Bertha Brecher, a salary of $55. Bertha Brecher rendered services to the corporation as a designer and the other two defendants were salesmen. The available books do not show a salary for the bankrupt, however.

The testimony is conclusive that at least up to a few years ago Joseph Brecher was indefatigable in the service of the defendant corporation. He negotiated loans at the bank and endorsed the company's notes therefor. He conducted extensive correspondence with its largest and most important customers. Some of these letters bore the signature "Joseph Brecher" in longhand and some had the signature typed, together with his initials in the lower left hand space commonly accepted as indicating the initials of the individual who dictates a business letter. The explanation of the bookkeeper, that she put his name down because he annoyed her; to make him feel good; from force of habit; or to dress up the letter, was ridiculous. In any event, one pearl fell from her unwilling lips; namely, that he did everything in and about the office. It is true that she immediately attempted to

explain this by stating that she meant that he wrapped up packages or received deliveries of goods (which fact was already in evidence by virtue of signed receipts). I prefer to appraise her statement at its true value when it was uttered as a spontaneous admission that his services in general were those of a person who supervised the operation of the business in all its departments. The bank officials testified to the financial operations conducted on behalf of the corporation by the bankrupt alone. They said they insisted on his endorsement of the firm's paper because the institution always required the personal endorsement of the real owner in the case of small corporations. Indeed, Kramer, a bank official, testified that when the bankrupt was asked why his name did not appear as an officer of the company, his explanation was that he had a state bank charter which would be forfeited if he were formally identified with the company. This statement of the bankrupt was untruthful for the evidence showed that the charter, such as it was, had been withdrawn by the State Banking Department years before in 1923 when the bankrupt voluntarily dissolved his banking business. During all this time it seems that the banks and various other contacts of the corporation were dealing with Joseph Brecher as its owner and it is difficult to understand how this could have continued without the knowledge and acquiescence of the various defendants. In two known instances the bank accepted his written instructions to cash corporate checks signed by him as attorney for Bertha Brecher who, with Fay Brecher, were the officers entitled to sign checks. On one of these occasions the letter, bearing his signature, dated August 6, 1935, reads: "Today is my payroll and I am taking the liberty of signing my payroll checks with Mrs. Brecher's name." It is inconceivable that Bertha Brecher, an officer of the corporation, one of the two officers authorized to sign checks and as active as it was claimed she was, would not be aware of the payroll withdrawal for two weeks. She would necessarily have to acquaint herself with the circumstances surrounding a withdrawal not made by her and thereby become familiar with the letters bringing it about. This withdrawal of funds by check signed "B. Brecher by J. Brecher" and explained by letter from the bankrupt was repeated on August 9, 1935. In July, 1931, a renewal

of a due note was made by the note of Fay Brecher Krass on the strength of a letter written by the bankrupt to the Chatham & Phenix National Bank, stating that she was the proxy for Mrs. Brecher and had authority to sign for her. In the absence of evidence of repudiation, this latter letter may be taken as proof of knowledge of the transaction by Bertha Brecher since it invaded the field of her corporate duties. Its repetition in 1935 in the same bank—the institutions were merged—may be said to indicate her approval and ratification of his activities in all their proprietary character.

In 1936 the bankrupt wrote to the Manufacturers Trust Company condemning the charge of $5 for commission on a traveler's letter of credit for Mrs. Brecher in which he wrote: "Which you told me would not be charged to me," and continuing, he said: "Please make the proper adjustment on our account." This letter was subscribed "Venida Blouse Corp. J. Brecher."

The bookkeeper stated that Joseph Brecher had been ill and away from the business for some three years immediately preceding the trial of this action but this testimony was flatly contradicted by the voluminous correspondence of the corporation bearing his signature.

In spite of Joseph Brecher's activities in the firm, if we are to accept the corporate records and the word of the bookkeeper, he received no salary or money from the corporation. The bookkeeper claimed a position of confidence and indeed testified that the business which employed some 45 people was a one-man business, herself being the man referred to. She stated that each week one check for all the salaries was cashed at the bank together with a check or checks totaling the sum of $235 payable to cash. This sum of $235 was then put in a separate envelope and delivered to Bertha Brecher, together with the envelope containing her salary in the sum of $55. The witness professed not to know what happened to the $235 after that. This practice had continued throughout the entire term of her employment which commenced in 1928. The sum of $235 appears in the purchase book weekly, made up of from one to, in some instances, three debits on account of goods purchased. She reluctantly admitted these were false when faced with the documentary proof and that they were

made at the request of Leo Brecher. The utmost care was taken and a high degree of finesse practiced in the composition of the sum of $235. Sometimes even cash discounts were computed and entered as such, and even where as many as three checks were used to compose the total, odd sums of money, including the pennies, were allotted to each. The accounts credited with these purchases were frequently actual tradesmen who were dealing with the corporation and in other instances represented fictitious persons or firms. The assistant secretary of the Manufacturers Trust Company testified that Joseph Brecher had told him in 1932 that cash withdrawals were made out of the business through the purchase account.

In 1926 it appears application for the reinstatement of an insurance policy on his own life was made by the bankrupt. In his application he stated that he was the owner of a dress business. The bookkeeper of Venida stated that to her knowledge the premiums for this policy and other policies which had been issued to him were continuously paid by corporation checks during her employment by the corporation; that all of them were entered in a loan account made to appear as a debit due from the defendant, Bertha Brecher, and none of them were ever repaid to the defendant corporation. There is considerable documentary evidence showing that the negotiations regarding extensions of time for premium payments on these insurance policies were conducted by Joseph Brecher, and there is no evidence in the case that anyone else, including the officers of the corporation, ever displayed any personal interest in them although Bertha Brecher, the bookkeeper said, did take care of some of the correspondence.

From all this evidence I have no doubt and I find as a fact that the present corporation, the defendant, Venida Blouse Corporation, has at all times been the property of Joseph Brecher, the bankrupt. The evidence is that the shares in this corporation, issued to Bertha Brecher and Fay Brecher Krass, were issued by it in exchange for the same number of shares of Venida Dress Corporation, its predecessor, whose business it took over and whose debts it assumed in 1929. The bookkeeper's testimony is conclusive that the payment of $235 weekly in a separate envelope to Mrs. Brecher antedated, by at least four years, the organization of the new corporation and covered for that length of time the operation of the old. Coupled with all the other evidence the inference may reasonably be drawn that the weekly delivery of $235 in a separate envelope to Mrs. Brecher represented a payment to Joseph Brecher and was for his use. This conclusion is all the more reasonable if we consider that the testimony indicates the volume and value of the services rendered by the bankrupt to the corporation over an extended period; that not one cent was credited to him for his services in any fashion; that the books showed salaries for everyone else connected with the company, including Bertha Brecher; that the amount paid Bertha Brecher, compared with the amounts paid the other relatives, was commensurate with her apparent services. Finally, if we consider that there is no payment by way of any dividend made to anyone and couple it with the information given to the bank that the profits were withdrawn through the purchase account, the conclusion is entirely reasonable that this weekly withdrawal represented profits or a dividend and are properly assigned to Joseph Brecher because of his ownership of the corporation. I, therefore, hold that both the defendant corporation and its predecessor were owned wholly by the bankrupt. I further hold that the wife and daughter were actively and knowingly engaged in serving the purpose of the corporation which could not have been honest. I hold this lack of honesty is so apparent that the dishonest purpose must have been apparent to those actively interested in it and that by lending their services to the fulfillment of its purpose they became parties to its operations, looking to the accomplishment of its fraudulent ends to keep the bankrupt enriched at the expense of his creditors. The wife and daughter were both active conspirators. While I recognize there is no presumption casting the imputation of guilty knowledge and intent on their part back from the time in 1928, when the proof demonstrates it beyond doubt, all the evidence well warrants the inference that it did exist during the intervening period and that it tainted the issuance of the stock to them at the time of the organization of the original corporation in 1923 and I hold that the organization of the original corporation was conceived and perpetrated in active fraud and with a fully developed intent to defraud the bankrupt's then

existing creditors. The objection may be made that this is taking property from an innocent wife and daughter and giving it to creditors who appeared to have been listless. The answer to that is that if the creditors were listless the testimony shows that they were lulled by the fraudulent acts of the defendants into a belief that payment of their claims was hopeless, and further, that if any of the defendants were innocent they could have established the fact easily. In view of the utter absence of any explanation for the failure of the defendants or any of them to testify or appear in the courtroom at any time during the trial or submit any evidence in their own behalf, I hold that on the whole case the corporation, from its inception, at a time when the bankrupt was insolvent, was organized with his funds, with the intent and purpose to hinder, delay and defraud his creditors, and that the wife and daughter actively conspired to accomplish this fraud and that the stock was delivered to them for that purpose without any consideration from them and was a fraudulent transfer. The failure of the defendants to produce corporation books and the inability of the trustee to find any except those in use at the time of the bankruptcy confirm this conclusion.

The son too lent himself to the accomplishment of the evil purposes of Venida. It was he who instructed the bookkeeper in the vicious practice adopted to withdraw the profits. This betokens not only his knowledge of but his participation in the entire unholy scheme.

I direct the defendants, Bertha Brecher and Fay Brecher Krass, to deliver up and turn over the stock of the Venida Blouse Corporation for cancellation and Venida Blouse is directed to issue a certificate of stock for 100 shares to and in the name of the trustee in bankruptcy.

The trustee is entitled to an accounting by the corporation for all withdrawals made by the other defendants and said defendants shall account for all monies or properties so withdrawn.

I further direct that the plaintiff may have judgments against the defendants other than the corporation for such sums which may appear due to the corporation on said accounting, and costs of this proceeding against Bertha Brecher and Fay Brecher Krass.