In re Jeremy M. REMILY, Debtor.

Kip M. Kaler as Bankruptcy Trustee, Plaintiff,

v.

Jeremy Remily, Dakota Valu, Inc. and Dakota Valu Express Inc., Defendants.

Bankruptcy No. 03–30459. Adversary No. 03–7037.

United States Bankruptcy Court, D. North Dakota.

Jan. 22, 2004.

Jon R. Brakke, Vogel Law Firm, Fargo, ND, for Debtor.

## *MEMORANDUM AND ORDER*

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding arises by Complaint filed July 17, 2003, by Chapter 7 Bankruptcy Trustee Kip M. Kaler seeking a determination that Debtor Jeremy M. Remily's conversion of notes payable against Defendants Dakota Value, Inc., and Dakota Valu Express Inc. to capital contributions constitutes a fraudulent transfer under 11 U.S.C. § 548. As recovery, the trustee seeks monetary judgments against Dakota Value Express, Inc., in the amount of $70,186.47 and against Defendant Dakota Valu, Inc., in the amount of $339,789.00 pursuant to 11 U.S.C. § 550. The trustee further seeks a denial of the Debtor's bankruptcy discharge under 11 U.S.C. § 727(A)(2), (3) and (4). By Answer filed August 15, 2003, the Debtor denies both that a fraudulent transfer occurred and that he has committed any conduct justifying the denial of his discharge. The trustee and Defendants Dakota Valu, Inc. and Dakota Valu Express, Inc. stipulated prior to trial that the trustee's claims against these Defendants would be resolved consistent with the Court's findings on the trustee's fraudulent transfer claim against the Debtor.

The matter was tried on December 2–3, 2003.

## I. FINDINGS OF FACT

Since 1998, the Debtor has been the sole shareholder in Dakota Valu, Inc., formerly operating a grocery store in Lisbon, North Dakota. He has similarly been the sole shareholder in Dakota Value Express, Inc., formerly operating a grocery store in Gwinner, North Dakota, since 2000. Neither corporation is currently doing business as a grocery store.

Both of the Debtor's businesses had significant debt, and by 2001 neither store was doing well; in fact, both were losing money. The Debtor testified that the marketing and expected sales projections generated by his primary wholesaler, Super Valu, never materialized. Although his wife had a job teaching special education and they lived off her income for a while, her salary was insufficient to cover the money lost by the stores, and the Debtor borrowed against their assets and liquidated other assets. He testified that he took out personal loans rather than business loans because banks were unwilling to lend more money to the businesses because they were not faring well. The Debtor used personal assets to inject money into the businesses to keep them going. He testified as to the sources of the monies he injected into the businesses, and his bank account records detail the flow of

money. According to the Debtor, the total amount transferred to Dakota Valu Express, Inc., was $112,000.00, and the total amount transferred to Dakota Valu, Inc., was $465,000.00. All of the personal assets he sold went to either creditors or into the businesses, and the Debtor did not receive a salary in either 2002 or 2003.

In the fall of 2002, the Debtor entertained the possibility of partnering with a dairy business that had expressed an interest in such to the Debtor. The dairy business hired a consultant to assess the financial health of the Debtor's businesses, and, as a result of the consultant's review of the businesses' financial documents, the Debtor was apprised of a line item called "Note Payable—Officer" for each of the businesses indicating substantial debts to the Debtor. The Debtor testified that he realized the contributions he had made over the years to the businesses had been improperly itemized as loans to the businesses under the Note Payable—Officer line item rather than as capital contributions.

Bradley Booth worked for more than 14 years, until September 2003, as a tax specialist and assistant manager of retail accounting for Super Valu Retail Accounting Services. He provided accounting, payroll, and general ledger (balance sheets, cash flow, operating, taxes) services for the Debtor's businesses. Booth testified that the subject of the nature of the transactions arose for the first time during the meeting with the dairy business representatives discussed above. He said the representatives were concerned about the note payable because any funds they might inject into the businesses could be used to pay off the note, leaving them in a compromised position. Booth stated the Debtor responded that the transactions were not loans and instead should have been itemized as capital contributions. Booth made

the appropriate accounting changes in light of the Debtor's information. Booth stated that in hindsight it would have been more accurate to describe the transactions as capital contributions from the beginning, but that he would not amend the prior documents because the current report is accurate, and the prior reports illustrate for lenders how the monies became capital.

Booth prepared financial statements for the Debtor's businesses during his employment by Super Value Retail Accounting Services. He testified that the nature of transactions are characterized in financial statements by either accountants, supervisors or the assistant manager. He stated that in general, the Note Payable—Officer line item is used either to record loans or capital infusions from officers or to balance the books when an accountant cannot identify a deposit. Although the accountants often contact clients if they have questions about a transaction, Booth testified that sometimes the only way to get the accounting done is to make certain assumptions. He said that even though he wishes accountants could account for every dollar coming in and going out of a business, sometimes they need to take shortcuts.

Booth described a ledger as a track record or running balance of money coming into and flowing out of the business operation for a particular line item. It includes a description column, completed at the accountant's discretion, identifying the nature of each transaction. The Note Payable—Officer ledger produced by Super Valu Retail Accounting for Dakota Valu, Inc., includes descriptions of four transactions in 2001 each as "Loan from Jeremy." Transactions in 2002 are described as "Monies from Jeremy." Booth also described a ledger for Dakota Valu Express, for the Note Payable—Officer account. This ledger does not reference

any "loans," but does include multiple transactions described as "Pers Monies into store."

Booth further testified that the Debtor never told him the deposits were loans, nor did he and the Debtor ever have a discussion about whether itemizing the transactions as loans correctly reflected their nature. Rather, Booth said he itemized the Debtor's contributions as notes payable as a conservative method of accounting. Specifically, as an accounting practice, he said it is better to present an event as a liability on the balance sheet so the event weighs conservatively into the liquidity ratios. He said he would classify a transaction as a capital contribution only if he was certain it was a capital contribution because once a transaction has been classified as such, it is very difficult to change its classification.

Booth also prepared the tax returns for the Debtor's businesses. He stated that in the tax documents he also called the transactions loans as a conservative practice. He further stated that he does not feel the characterization is in any respect misleading because it did not affect the businesses' taxes.

Although the Debtor received financial statements quarterly (later three times per year to reduce costs), he stated he was only interested in the sales, expenses, revenue, payroll, and "bottom line" figures because he did not understand much of the information and relied on the accountant. He explained that his reliance on the accountant was also necessary because he was occupied with ensuring that expenses were kept under control, sales were growing, and money was in the accounts. He also managed both businesses because he could not afford assistant managers. He described his various duties as: ordering groceries, gasoline and other merchandise; scheduling; mowing grass and removing snow; covering sick employees' shifts; unloading trucks; pricing merchandise; proofing advertisements; and dealing with banks.

The financial statement prepared for Dakota Valu Express, Inc. for the period ending September 7, 2002, shows the amount in the "Note Payable—Officer" line item as $23,722.23. The financial statement for Dakota Valu, Inc. for the same period shows the same line item in the amount of $339,789.04. Both businesses' financial statements for the next period, ending December 26, 2002, show a blank in the line item. The Debtor testified that the proper classification of the deposits, after the meeting in October 2002, resulted in the zeroing out of the line item.

Super Valu also performed bank reconciliations, and the Debtor testified that an accountant, usually Booth, would telephone him with questions about the nature of a transaction. The Debtor stated that whenever he was asked about a cash infusion he told the caller it was "money he was putting into the stores." He testified this is the only characterization of the transaction he ever used, and more specifically, that he never called the contributions loans or notes payable because he never considered them such. Rather, he thought of the Note Payable—Officer lien item as a balancing account in which the accountants would put deposits that could not otherwise be accounted for. There were no promissory notes or repayment terms in conjunction with the transactions, nor was there an agreement about interest to be paid. When asked why he did not make them loans so that he could be repaid, the Debtor stated that he just wanted to see the businesses work.

Rebecca Rosenkranz, a supervisor at Super Valu Retail Accounting Services, oversees bill-paying and accounting services

and reviews financial statements after they have been prepared. Prior to her supervisory position, she was an accountant for 21 years in the same department, availing her of considerable familiarity with all of the accounting documents and their preparation. She testified that clients send in weekly sales reports, documentation of other transactions, and check registers. She stated that when questions arise as to the proper classification of a transaction, the accountants ask the client about it. With specific regard to the Note Payable—Officer line item, she stated that a number of types of transactions are classified into that line item, such as unknown deposits on bank statements. Although she never discussed with the Debtor the proper itemization of unidentified deposits, she approved of the itemization of them into the Note Payable—Officer line item. Until the end of 2002, she was unaware that the unidentified deposits were improperly itemized.

The minutes of a special meeting of the board of directors of Dakota Valu, Inc., dated October 1, 2002, state that "the meeting was called for the purpose of considering a proposal by Jeremy M. Remily to cancel or release the corporation from all liability on the promissory note in the principal sum of $339,789.04 dated September 7, 2002 in exchange for common stock." The Debtor testified that although the minutes state that there was a promissory note, no such promissory note ever existed. Moreover, when the Debtor realized the contributions had not been properly itemized, he did not tear up any promissory notes or mark any of them paid, despite that the minutes stated he would do so, because they did not exist. Although he signed the minute sheet showing the loan, the Debtor testified that he often signed documents given him by his lawyer without reading them.

A stock transfer ledger for Dakota Valu, Inc., was kept by the Debtor's attorney. It notes that the Debtor was issued additional shares of stock on October 1, 2002, and the Debtor explained that this notation corresponds to the action discussed in the corporate minutes. The Debtor testified that he discussed business affairs with the attorney, but relied on the attorney to take appropriate actions with regard to the legal affairs of the business. The Debtor did not take additional stock with each contribution because, he stated, it would not make sense to do so because he was the sole shareholder.

The Debtor ultimately was unsuccessful in obtaining additional financing and by 2003, he did not have any remaining assets to liquidate to keep the businesses afloat. In September 2003, the Debtor sold both businesses and used the proceeds to pay creditors. Because the proceeds were insufficient to pay all the businesses' debt, the Debtor received nothing from the sales.

The Debtor filed a Chapter 7 bankruptcy petition on March 17, 2003. On the Statement of Financial Affairs, the Debtor did not list the conversions of the loans to stock in each of the companies. When asked why not, the Debtor explained simply that he did not think he had to list them as transfers. After conducting the section 341 meeting of creditors in the Debtor's case, the trustee also conducted a Rule 2004 examination and then brought the instant adversary proceeding. The trustee testified that he brought this action because the Debtor changed the nature of the debt owed him by the businesses without disclosing it in this bankruptcy petition. Moreover, the trustee stated that the information he gleaned from the Rule 2004 examination suggested dishonesty—specifically that the Debtor changed the nature of the debt from a loan to stock and

then claimed the stock as exempt and worth nothing. In short, the trustee believes the bankruptcy estate would be in a better position as a general creditor than as a shareholder, the transactions should have been disclosed, and the Debtor did not include any information in the petition to indicate the transfers had occurred.

## II. CONCLUSIONS OF LAW

By his Complaint, the trustee argues both for the denial of a bankruptcy discharge to the Debtor and for the avoidance and recovery of the allegedly fraudulent transfers made by the Debtor. First, the trustee argues the Debtor converted the loans to stock to protect the businesses from the claims of his creditors and the bankruptcy estate. In this respect, the trustee argues the Debtor's conversion of his interest as a creditor of the businesses to himself as a stockholder in the businesses constitutes a fraudulent transfer which may be avoided pursuant to 11 U.S.C. § 548(a)(1)(A) and (B).

Second, the trustee argues the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2), on the ground that the Debtor intended these transfers to hinder, delay, or defraud his creditors or the bankruptcy estate; pursuant to 11 U.S.C. § 727(a)(3) on the ground that the Debtor concealed or failed to keep records as to his financial condition or business transactions; and pursuant to 11 U.S.C. § 727(a)(4), on the ground that the Debtor made false oaths or accounts in connection with his bankruptcy case.

### A. Fraudulent Transfer

The trustee's first cause of action is brought under 11 U.S.C. § 548(a)(1) which provides:

(a) (1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

■ Curiously, the Debtor fails to mention, much less address, section 548(a) in either his trial statement or his post-trial brief. Notwithstanding, the trustee bears the burden of proving each element under section 548. *Halverson v. Funaro (In re Frank Funaro Inc.)*, 263 B.R. 892, 899 (8th Cir. BAP 2001) (citing *Kaler v. Craig (In re Craig)*, 144 F.3d 587, 590 (8th Cir. 1998)).

■ As a threshold matter, both subparts (A) and (B) of section 548(a)(1) require that a transfer occurred, and the parties dispute whether the Debtor's conversion of the loans to stock constitutes a transfer.

The Bankruptcy Code defines "transfer" broadly and includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property...." 11 U.S.C. § 101(54). The legislative history to this section provides, in part:

A transfer is a disposition of an interest in property. The definition of transfer is as broad as possible.... Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody or control even if there is no transfer of title, because possession, custody, and control are interests in property. A deposit in a bank account or similar account is a transfer.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 27 (1978), *reprinted in* U.S.S.C.A.N. 1978, 5787, 5811; *see Village of San Jose v. McWilliams,* 284 F.3d 785, 793 (7th Cir. 2002) (citing legislative history of definition of transfer); *Bernard v. Sheaffer (In re Bernard),* 96 F.3d 1279, 1282 (9th Cir. 1996) (same).

The Debtor testified that at all times he considered these payments as additional capital contributions to the two businesses. In support of his contention that the cash infusions were not loans, the Debtor testified that there was no agreement as to interest rate, repayment terms, or maturity dates. Moreover, no promissory notes were ever drafted or signed, and no payments were ever made by either of the businesses to the Debtor.

In asserting that the Debtor's actions constituted a transfer, the trustee relies on a number of documents to prove that the contributions were indeed loans. First, the trustee relies on the financial records of Super Valu, Inc. The financial statements prepared by Super Valu include a line item for "Note Payable—Officer"—implying the existence of debts of the businesses to their officers—but the current and former Super Valu employees, Rosenkranz and Booth respectively, each testified that the Note Payable—Officer line item was used in part to account for unidentified deposits. They both testified that, in other words, that particular line item was used as a balancing tool. Both employees further testified that they were never told by the Debtor that the contributions were loans. In fact, Super Valu's ledger descriptions for the Note Payable—Officer line item start with a reference to the monies as a "Loan from Jeremy." However, later references were to "Monies from Jeremy" or "Para Monies into Store." These descriptions suggest that at some point Super Valu became aware that the monies in the Note Payable—Officer were not loans, and instead were capital contributions. Next, the amounts Super Valu included in the line item do not reflect the amounts the Debtor actually contributed to the businesses. The Debtor provided documentation of his contributions totaling $465,907.94 to Dakota Valu, Inc. and $12,000.00 to Dakota Value Express, Inc., and the trustee does not dispute either the amount of the Debtor's contributions or the dates of his contributions to the businesses. Had the Note Payable—Officer line item had been used Super Valu to track loans made by the Debtor to the businesses, its ledger descriptions should have reflected the contributions the Debtor recorded. Upon careful consideration of this evidence, the Court finds that the Super Valu records do not provide reliable evidence that the Debtor's contributions were loans.

The trustee also relies on the tax returns of Dakota Valu, Inc. to support that the contributions were indeed loans. Booth testified that he used the information in the financial statements in prepar-

ing the tax returns for the businesses. He testified that he always characterized money put into a business by a principal as a loan rather than a capital contribution, unless specifically instructed otherwise, and he was never told by the Debtor to characterize the contributions as capital. He explained that characterizing monies as loans preserves maximum flexibility as to how the monies are characterized in the future because once cash put into a business is characterized as capital, it can never be repaid as a loan. On the other hand, capital that is—perhaps incorrectly—characterized as a loan can always be properly recharacterized later. The reliability of the tax returns is suspect because although the returns for both businesses were prepared by Booth using the financial statements, the returns for Dakota Valu Express, Inc. do not show any loans by the Debtor, even though the loans were included on the financial statements. The Court is simply not convinced that the tax returns of Dakota Valu, Inc., which indicate loans to it by the Debtor, are any more telling than those of Dakota Valu Express, Inc., which do not. In short, the Court is not persuaded that the tax returns of Dakota Value, Inc. support the trustee's position.

The trustee also relies on a set of corporate minutes adopted by the board of directors of Dakota Valu, Inc., and signed by the Debtor, stating that a debt owed to the Debtor was converted to a capital contribution. The Debtor testified that these minutes were prepared by the attorney for the businesses after the Debtor told him Super Valu was correcting Dakota Valu, Inc.'s financial statements that had erroneously classified the Debtor's multiple contributions as loans. The Debtor testified that the attorney never discussed with him the contents of the minutes, and the Debtor did not review the contents of the minutes before signing them. Although the

minutes refer to a note, no other evidence whatsoever indicates the existence of such a note. Also, the Debtor had been putting money into Dakota Value, Inc. since 1999, but there were no corporate minutes approving these other alleged loans. It is inconsistent for the conversion of the loans to capital to have been documented when the loans themselves were not documented. Lastly, the amount of the debt referenced in the minutes is inconsistent with the actual amount the Debtor put into Dakota Valu, Inc.—the amount indicated as loaned by the Debtor in the minutes is $339,789.04, but the Debtor's records show that he in fact put more than $400,000.00 into Dakota Valu, Inc. The trustee's reliance on these minutes to support his contention that the contributions were loans is problematic for the same reason his reliance on the tax returns is problematic—if the existence of the minutes for Dakota Valu, Inc. has probative value, presumably the absence of any corporate minutes reflecting loans or a conversion of loans to capital for Dakota Valu Express, Inc. has equal and offsetting probative value.

The Debtor's records, on the other hand, clearly show the amounts the Debtor was putting into each business. His records do not contain any indication that the cash infusions were ever intended to be loans which is consistent with the Debtor not having given any loans. The trustee's only evidence that a transfer of debt to capital occurred is in documents generated by third parties whose bases for their characterizations of the contributions has been adequately explained as erroneous.

The Court is not convinced the Debtor disposed of or parted with property or with an interest in property in reclassifying the loans as stock. *See* 11 U.S.C. § 101(54). In other words, there was no transfer, and the trustee's claim under section 548(a)(1) fails.

## B. Denial of Discharge

The trustee also seeks to have the Debtor denied a discharge under 11 U.S.C. § 727(a)(2)(A), (a)(3) and (a)(4)(A). Section 727(a) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

\*     \*     \*     \*     \*     \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case:

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a).

■ Denying a debtor a discharge is a drastic remedy. *See McLaren v. McLaren (In re McLaren),* 236 B.R. 882, 893 (Bankr.D.N.D.1999). In light of the policy implications favoring debtors under the Bankruptcy Code, section 727 must be construed liberally in favor of the debtor and strictly against the objecting party, with the burden of proof thereunder resting squarely upon the latter. *See id.* The standard of proof is a preponderance of the evidence. *See id.*

### 1. 11 U.S.C. § 727(a)(2)(A)

■ The elements essential to barring a discharge under section 727(a)(2)(A) are:

(1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay or defraud either a creditor or an officer of the estate.

*Kaler v. Craig (In re Craig),* 195 B.R. 443, 449 (Bankr.D.N.D.1996).

In this case, the Court has already concluded that the Debtor's conversion of the loans to stock was a mere correction and not a transfer. Accordingly, section 727(a)(2) cannot serve as a basis for denial of discharge in the case.

### 2. 11 U.S.C. § 727(a)(3)

■ As a precondition to receiving a discharge, section 727(a)(3) compels a debtor to produce records which provide creditors with sufficient information to determine his or her financial condition and to trace his or her financial dealings with substantial accuracy and thoroughness for a reasonable period of time leading up to the bankruptcy filing. *Grau Contractors, Inc. v. Pierce (In re Pierce),* 287 B.R. 457, 461 (Bankr.E.D.Mo.2002). Section 727(a)(3) ensures that the trustee and creditors receive enough information to trace the debtor's financial history and to reconstruct his financial transactions. *Id.* While there is not a rigid standard as to how records are to be kept, sufficient information needs to be provided by the debtor so that the court and creditors are

not required to speculate on the financial history or condition of the debtor. *Id.* Although 727(a)(3) does not contain an intent element, it does impose a standard of reasonableness. *Davis v. Wolfe (In re Wolfe),* 232 B.R. 741 (8th Cir. BAP 1999). The debtor is therefore required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate. *Id.*

■ In this case, the trustee's claim is based on the Debtor's failure to keep records detailing the conversion of loans to capital. However, the trustee did not provide any evidence of records that were not maintained and turned over by the Debtor. Moreover, the Debtor's records establish the dates and amounts of the contributions to each of the businesses, and he has therefore reasonably accounted for what each of the businesses received from him.

3. 11 U.S.C. § 727(a)(4)(A)

■ In order to prevail under section 727(a)(4)(A), the trustee must establish the following five elements: (1) that the debtor made a statement under oath; (2) that the statement was false; (3) that the debtor knew the statement to be false; (4) that the debtor made the statement with fraudulent intent; and, finally, (5) that the statement related materially to the bankruptcy case. *McLaren,* 236 B.R. at 894. Because there was no transfer, the Debtor had no obligation to include the conversion of the loans to stock on the Statement of Financial Affairs.

Based on the foregoing, the Complaint of Trustee Kip M. Kaler based upon sections 548 and 727 of the Bankruptcy Code is dismissed.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**